## Loughney v. Loughney, Appellant.

Argued November 17, 1933.

Before KELLER, CUNNING-
HAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Frank J. Eustace, Jr.,* for appellant.

*George J. Segal,* and with him *Charles H. Sporkin,*
for appellee.

OPINION BY BALDRIGE, J., December 16, 1933:

This appeal is from an order of the court below
granting a divorce on the ground of desertion.

The parties were married in New Orleans on April
24, 1909. The husband, a blacksmith and miner, ob-
tained work in Mexico and at various places in the
southwestern part of the United States until 1912,
when, accompanied by his wife, he returned to Phila-
delphia, where they both had originally resided. They
lived together for about six months when the libellant
again went west. The respondent obtained employ-
ment and made her home with her sister in Phila-
delphia for about a year, when the libellant returned
and he and his wife resumed living together once
more. In 1914 he left again in search of work and
was absent until August, 1917. He did not ask her to

go with him but stated that he was moving about too much to have a woman along. Up until this period, no serious difficulties apparently were experienced, although, under the testimony of the libellant, his wife was dissatisfied with living conditions in the mining camps in the west and desired him to obtain employment in Philadelphia. The libellant said he sent two telegrams to his wife that he was returning home, but when he reached Philadelphia and went to her residence, found that she was in Atlantic City. The wife stated, and she was corroborated by her sister, that these messages were not received, and, as she had a week's vacation, she was spending it in Atlantic City. Loughney said that he sought employment immediately, and through his brother's aid got work at Camp Dix, and left for that place the following Sunday; that a couple of weeks later he returned and then first saw his wife. He continued his work at Camp Dix until the following January, although he frequently called weekends upon his wife. He returned to Philadelphia the succeeding January and went to live with his mother, occupying a room in that home which he shared with a brother. The other bedrooms were fully occupied by a married brother, his wife, and two children. Thereafter, the libellant had no work for two years. The respondent was living during this time with her sister, Mrs. Dugan, and she and another sister, Mrs. Hughes, occupied one room.

According to the husband's testimony, he requested his wife to make a home with him, which she refused to do, for the reason that he had deserted her for a period of two years and she did not care to live with him. Respondent denies that she refused to live with her husband, but, on the contrary, that she desired to reestablish a home and wanted him to find a suitable place. It is not contradicted that the husband never actually rented a room or house, or otherwise provided

a place to accommodate both his wife and himself, or that friendly relations continued between them. She gave him half of $900 which she had saved from moneys he had sent her, and under her testimony, they had sexual intercourse at different times when the opportunity was afforded. These conditions existed until June, 1918, when he went to her apartment to obtain her signature to some papers in connection with the transfer of certain property in which he had an interest. He testified that when he knocked at the door, a man, by the name of McCann, opened it, and when respondent learned that it was he who sought admission, she called to McCann to keep him out; that when he entered and explained to McCann that he was her husband, he found her in bed in a negligee; that she requested McCann to protect her and called her husband a vile name, and charged him with sneaking up and catching her in company with McCann. McCann threatened to throw him out "and have [him] knocked off, and have [him] beat up and the like of that." The libellant then withdrew and he said that from that time on he was unwilling to live with respondent. This incident as told by the husband was denied by Mrs. Loughney. She stated that McCann was an old friend of her family and had called upon her about five minutes prior to libellant's arrival; that he had made some inquiries of her respecting the family and had picked up a book from the table at which he was looking when a knock came at the door; that she was in bed, ill from kidney trouble; that when her husband called she asked McCann to go to the door, and when she learned that it was her husband she called to him to "come in;" that when her husband saw McCann he inquired who he was, as they were not acquainted, and she introduced them. Her husband stayed but a few minutes and then left, without a fight or any disturbance having occurred. Thereafter, Loughney ceased

visiting his wife and did not see her again until 1922, when she requested him to give her their marriage certificate for the purpose of obtaining a religious annulment of their marriage on the ground of consanguinity, as she and her husband were distant cousins, and, under the laws of the Catholic Church, of which they were both members, a special dispensation, which was never sought or granted, should have been obtained. The certificate was delivered and the annulment obtained. This action, of course, did not dissolve the legal ties of matrimony; but, according to the explanation of the respondent, it was necessary to give her good standing in her church. No further relations were had until 1928. Admittedly, the respondent resumed her maiden name, but it appears that in the mill where she worked that practice was not unusual. In fact, she used her maiden name in the business she was carrying on even when she lived with her husband.

In 1928, when the libellant was living in an apartment at 1521 Pine Street, of which he was part owner, he invited the respondent to attend several social gatherings at which others were present. The respondent testified that she not only accepted the invitations, but also remained overnight with him, and that they resumed marital relations, he having intercourse with her as late as October of that year. The libellant admitted that his wife stayed all night at his apartment, but testified that he had left in the early morning and had taken home several of the guests who lived in Chestnut Hill, and that he did not return until about six o'clock, and then went to the garage, apparently without changing his clothes, to begin his day's work. Respondent alleges that on another occasion in 1928, the libellant stayed at her home all night and had intercourse with her. He does not deny that he remained overnight at her home, but states that it was following

the death of a brother and that none of the family retired that night. This course of conduct did not indicate such an actual abandonment of matrimonial relations as to constitute a malicious and wilful desertion: Hartner v. Hartner, 75 Pa. Superior Ct. 342; Saville v. Saville, 76 Pa. Superior Ct. 458.

The record discloses that, during the period in 1917 when libellant alleges the desertion began, and he was urging his wife to live with him, he did not have any room, apartment, or house, to which he could have taken her to resume marital relations. When asked from what place his wife had deserted him, he named *her* boarding place. It was incumbent upon him to show that he had, in good faith, provided a suitable home; otherwise, there could be no desertion. There was no mutual place of abode for her to abandon after he came back in 1917; there was no complete estrangement or permanent cessation of the social relations, or proof of other facts establishing a wilful and malicious desertion: McBrien v. McBrien, 63 Pa. Superior Ct. 576; Swantkowski v. Swantkowski, 80 Pa. Superior Ct. 400.

Libellant admits that owing to the McCann incident he did not from that time forward desire to live with his wife; that he would not take her back. Therefore, the separation from then on was consentable unless adultery had been committed: Lodge's Est., 287 Pa. 184, 134 A. 472. He may have been suspicious of his wife, but he neither charged her on the record with adultery nor argued that she was guilty of that offense. We can but regard their remaining apart thereafter as mutually acquiesced in, and that is insufficient for divorce on the grounds of desertion: King v. King, 36 Pa. Superior Ct. 33; Crandall v. Crandall, 66 Pa. Superior Ct. 153; Pomerantz v. Pomerantz, 71 Pa. Superior Ct. 241.

Furthermore, the respondent sought a support order

in the municipal court, and on December 31, 1928, under an agreement, an order of $10 weekly was entered, which libellant paid until March 26, 1931, when it was reduced to $8 a week. The petition to reduce was based solely on his inability to pay, and the testimony was confined to that question. It is conceded that a proceeding in the court of quarter sessions, under the Act of April 13, 1867, P. L. 78 (18 PS secs. 1250-1254), resulting in an order for the payment by the husband of an allowance to his wife, will not bar a divorce at his suit on the ground of desertion: Bauder's Appeal, 115 Pa. 480, 10 A. 41; Van Dyke v. Van Dyke, 135 Pa. 459, 19 A. 1061. But the record of a suit for maintenance, although not conclusive, is admissible, and is evidence against him, which requires a strong case to overcome: Crandall v. Crandall, supra; Mehaffey's Est., 102 Pa. Superor Ct. 228, 156 A. 746.

We have carefully reviewed all the testimony in this case and are not convinced that libellant has successfully assumed the burden of showing that there was a wilful and malicious desertion as contemplated by the law.

Order of the lower court is reversed, and the libel is dismissed at the costs of the appellee.