## Michell v. Michell, Appellant.

Argued October 20, 1938.

Before Cunningham, Baldrige, Stadtfeld, Parker and Rhodes, JJ.

*Howard Kirk,* for appellant.

*Colbert C. McClain,* for appellee.

Opinion by Cunningham, J., January 31, 1939:

In this appeal by the wife-respondent from a decree of divorce, entered against her upon the ground of desertion, we are confronted with the duty of reaching an independent conclusion upon the question whether the husband-libellant, who surreptitiously removed himself and his personal belongings from their home on June 30, 1934, without such cause as would entitle him to a divorce, eight months later made respondent an offer of reconciliation in such good faith and sincerity as legally justified him, upon her declination, in charging her with wilful and malicious desertion.

The tragic feature of this case, in which the Commonwealth as the third party in every divorce proceeding is vitally interested, lies in the circumstances that this husband, earning a comfortable income as a salesman for a well known seed concern, and his wife, formerly a secretary to the head of a large mercantile business, have, after establishing their own home, in which they lived a happy married life for a number of years surrounded with all the comforts of an average

American home and in which a bright and attractive son was born to them, so changed in their attitude toward each other that the home is now rented to strangers, the appellant and their son live with her parents, and the husband and father in a single rented city room.

If the institution of marriage is to be preserved and the offspring thereof properly maintained and educated, it is essential that a husband and father seeking an absolute divorce prove by the clear weight of the evidence that, in the language of the statute, he is the "innocent and injured spouse," and that his complaint is made in "sincerity and truth" and not merely for the purpose of evading the obligations inherent in the relationship.

These uncontroverted facts form the background of the case. The parties, forty and thirty-four years of age, respectively, were married June 18, 1924, and for a year and a half lived with the wife's parents at Radnor. During the latter part of that period they acquired and owned by entireties a home at No. 645 Woodcrest Avenue, Ardmore, where their son was born May 15, 1927, and in which they lived happily—according to the testimony of libellant, until the spring of 1933, and under appellant's evidence until 1928. Whatever difficulties may have arisen between the parties between 1928 and 1934 were kept to themselves; the parents of appellant, who lived in the vicinity, and their nearest neighbors all testified that none of them had any intimation of friction or estrangement between libellant and appellant prior to the open breach which occurred on June 30, 1934.

The causes leading up to the separation and the time they arose are in controversy. Appellant testified that, beginning as far back as 1928, libellant removed his clothing from their bedroom and thereafter slept in a separate room. Relative to this period she said: "Jack (their baby) was born May 15, 1927, and until Easter,

1928, everything was all right. I don't know what happened then. He started to stay out nights, wouldn't come home to dinner, wouldn't call me up to tell me he wasn't coming. When I would ask him he wouldn't answer me or tell me where he had been." Referring specifically to the night of June 30, 1934, appellant said libellant had not been home for dinner that evening; that after having retired about ten o'clock she was aroused by the barking of their dog outside the house; and that as she went downstairs to let him in she passed her husband's room and "saw Mr. Michell had been in and taken all his clothes, taken everything out of the house. I never heard him come in." Libellant did not deny this testimony concerning the manner of his leaving.

Libellant had rented a single room in a rooming house at No. 6233 Sansom Street, Philadelphia, and from that date never returned to his wife and child. Until the fall of 1934, appellant remained with their son at the home. Libellant made no effort to see her or communicate with her, except through counsel, but in that way made several remittances for her support aggregating, he says, $150.

In September of that year proceedings were instituted by appellant in the Quarter Sessions of Delaware County for an order of support. They terminated in an order directing libellant to pay $20 per week—$12 for appellant and $8 for the child. It was also directed that libellant rent the house, collect the rents, pay the interest upon the mortgage, taxes, etc. Appellant and the child then went to live with her parents. The house—no longer a home for either party—was leased, through a real estate agent, to tenants, beginning October, 1934. The support order was complied with up to the date of the close of the hearings before the master.

Libellant's version of the separation was that there was no trouble between them until the spring of 1933,

when appellant removed his clothing from their bedroom and locked him out, failed to prepare his meals, refused to receive and treat him as a husband, and declined to give him any explanation of her conduct. Each positively denied the charges made by the other. At most there was nothing more than an even balance of the testimony relative to the circumstances leading up to the separation. As we agree with the finding of the master, "that at the time of the separation on June 30, 1934, neither the libellant nor the respondent had been guilty of conduct which would entitle the other spouse to a divorce," it is unnecessary to give any further consideration to events preceding the separation.

The master thus correctly stated the crux of the case libellant undertook to prove. "The libellant's case proceeds on the theory that although he left the respondent on June 30, 1934, he approached her in good faith within two years, to-wit, on February 25, 1935, and made a bona fide offer to resume the matrimonial relationship, which offer was improperly refused without cause by the respondent whose desertion began from the date of said refusal and continues to the present time."

The difficulty upon this branch of the case relates not so much to the ascertainment of the facts as to the inferences deducible, under the authorities, from the pertinent circumstances, preceding, attending, and following the offer. There is not much dispute in the testimony concerning the words spoken by libellant and appellant to each other, but the natural, and almost inevitable, query in cases of this kind is whether libellant's actions spoke louder than his words.

The master correctly found that an offer of reconciliation was made. He also found, and the court below adopted the finding, that the offer was made in good faith. It is with this latter conclusion that we find ourselves unable to agree. The master seems to have been under the impression that once the making of the

offer was proven the burden shifted to appellant to show it had not been made in good faith. We do not so understand the law. When libellant is given the benefit of every conflict in the testimony relative to his conversation with appellant, upon which he bases his charge that she deserted him, it still seems to us that she was justified in questioning the good faith of the offer.

An examination of the record discloses that during the eight months following libellant's separation of himself from his home and family he made not the slightest attempt to effect a reconciliation with his wife and was apparently so lacking in affection for his son that he did not even remember him at Christmas time. It is also clear that the attempt at reconciliation was not undertaken of libellant's own initiative, but is expressly admitted by him to have been made upon the advice of counsel. Without any intimation of any kind to appellant of his proposed visit, libellant, taking his brother-in-law along as a witness, appeared at the home of her parents on the evening of February 25, 1935. Appellant, as stated in her testimony, was naturally surprised at the suddenness of the visit. Excerpts from her testimony giving her version of the interview read: "Papa went and answered the door and came back in a few minutes and told me Harry was there and wanted to see me. I went in, and I was scared to death, I didn't know what it was all about. When I went in, the first thing Harry said to me ...... Q. Was there anybody with Harry? A. Frank Meindo (the witness). The first thing Harry said to me was that he heard Jackie had been ill for six weeks. 'Oh, no,' I said, 'as a matter of fact, he hasn't missed one day at school so far this year'—and he asked me if Jackie was in bed. I said, 'Yes, he is. Would you like to see him?' He said, 'Don't bother.' I said, 'It isn't any bother. I'll be glad to bring him down if he isn't asleep.' I went upstairs, and Jackie was not asleep, so I put his bathrobe and

slippers on and I brought him downstairs, and Jackie talked about his school work, about his different books, his stamp collection, and things like that. I don't know exactly how long he was down there. Then Harry told him he thought it was time for him to go back to bed again, so I took him back upstairs. ...... The next thing I remember Harry saying to me was, 'Mary, I'm willing to forget everything and start all over again.' I says, 'What have you got to forget?' and that was the only mention of getting together. Q. What was his reply when you said, 'What do you have to forget?' A. He didn't answer any more about that. Then he asked me what I needed [intended] to do about the house in Ardmore. I said it wasn't really up to me to say. I said I would talk to Mr. Kirk (her counsel) about it. That's all I remember him saying that evening. Q. How long did Harry and Frank Meindo stay at your house, as far as you recall? A. I couldn't tell you exactly how long, but I know I talked to Frank about his wife and children, how they were doing at school, and Frank discussed the same thing with me about Jackie, and he thought Jackie was doing marvelous, according to his reports. I brought out his report card and showed it to him."

Libellant's version of the interview reads: "A. I went out there on the advice of my counsel with the serious intention of having Mrs. Michell come back to live with me. At least, I hoped it would turn out that way. I wanted to see whether she would come back to me. She said that she would not live with me and that she did not intend to live with me any more. I asked her three separate times and she told me that she was not going to come back to me and that she would not live with me again. She told me positively that she would not live with me. Of course, this was somewhat of a shock to me because I did not think that our married life would turn out this way. It was somewhat of a surprise to me. Q. You asked her to return to live with you? A.

Yes, I did. I did ask her to return. We had the boy to think of. The boy had to have a father. I thought that we should be living together at least for the boy's sake."

Frank J. Meindo testified he was taken along as a witness; that he did not join in asking appellant to "come back and live with Harry"; and that his part in the interview "was strictly to listen and remember." His testimony corroborates, in general, the testimony of libellant, as indicated by the following quotations: "Then Henry brought up the subject—he asked Mary— he said, 'Mary, I think you and I ought to get together again as man and wife. We can't go on this way.' Q. What did she say to him? A. The first time she didn't— she said nothing, I don't believe. Henry just kept on talking. During the evening he asked her a number of times, three or four times, I am sure, at least three or four times; I am sure at least three times and maybe four. He brought it up and discussed other things in between and then he asked again the same thing. Mary said, 'We didn't get along before; I can't see how we can get along again'; she was happy, satisfied and contented where she was; there was no use going together again."

Appellant denied positively the testimony of Meindo that she stated she was satisfied and contented where she was, but the weight of the evidence is with libellant upon this matter.

Among the circumstances shedding light upon the question whether the offer was bona fide and made in a sincere attempt to effect a reconciliation, or merely a formal one designed to lay ground for an escape from marital obligations, these may be noted. Throughout the course of the entire interview libellant gave not even the slightest indication of any affection for appellant— did not even shake hands with her when meeting or parting. He had made no arrangement for regaining possession of their home, nor had he made any effort toward

securing any suitable place in which to live with his wife and son; all he had to offer were the four walls of a single rented room.  Under such circumstances his statement that he went there to have appellant "come back" to live with him and that he asked her to "return" is merely playing with words.  She had not left the common home; she had not slipped away under cover of night; it was his voluntary act that broke up the home life.  The record is barren of any evidence that he had taken, in good faith, any unequivocal step looking toward a resumption of the family relation.  *Cf. Weisbrod v. Weisbrod,* 103 Pa. Superior Ct. 267, 156 A. 542.

The libel was based upon paragraph (d) of Section 10 of the Act of May 2, 1929, P. L. 1237, 23 PS §10, which authorizes the granting of an absolute divorce when one spouse, "shall have committed wilful and malicious desertion, and absence from the *habitation* of the injured and innocent spouse, without a reasonable cause, for and during the term and space of two years." (Italics supplied)  Clearly, libellant had no "habitation," in fact or in contemplation, from which it could be said appellant had absented herself.

As stated by this court in *Loughney v. Loughney,* 111 Pa. Superior Ct. 214, 169 A. 460: "It was incumbent upon him to show that he had, in good faith, provided a suitable home; otherwise there could be no desertion."

It is quite true that in *MacDonald v. MacDonald,* 108 Pa. Superior Ct. 80, 83, 164 A. 830, cited and relied upon by libellant, we said: "It is, of course, the duty of a wife to live with her husband at such reasonable place which he can according to his means provide as a home. Since it is the obligation of the husband to provide a home, his choice in the matter is controlling providing it is exercised in good faith."

But in that case the husband had actually purchased and furnished a comfortable house and in good faith asked his wife to leave the residence of her mother and reside with him in their own home.  It seems to us only

natural that appellant, under all the circumstances of the interview, would be suspicious of the good faith of libellant. It was a strange way for a husband, who had broken up their home and displayed the utmost indifference toward the welfare of his wife and child, to seek a reconciliation—appearing, as he did, at the temporary residence of his wife, without any notice of his coming and accompanied by a third person who had been instructed to listen to everything that might be said between the parties in order to prepare himself to act, if necessary, as a witness. To expect, under such circumstances, any frank and unrestrained discussion between a husband and wife of the causes of their estrangement and of the means by which a reconciliation might be effected is contrary to human nature and human experience.

Nor did libellant's subsequent conduct indicate the slightest desire upon his part to reach an understanding with appellant. The "six months'" delay required by section 17 of the statute had barely elapsed when, on September 5, 1935, he instituted these proceedings without having made even another gesture toward reconciliation, and the hearings before the master began March 30, 1937. No time was wasted in getting the machinery of the law into operation.

The general difficulty with this case is that we are unable to find upon the record any evidence of words or deeds by this libellant from which we can confidently say that appellant should have been convinced he intended to treat her in the future as a husband should, with affection and respect, and to again establish the confidence and mutual regard which both agree characterized the early years of their married life. On the contrary, it seems to us that a consideration of the record as a whole brings this case within the reasoning and letter of the decision of this court in *Walsh v. Walsh,* 117 Pa. Superior Ct. 579, 178 A. 399. In that case the underlying question was whether a letter

written by the libellant to the wife-respondent, requesting her return, constituted such a bona fide offer of reconciliation that its rejection amounted to a wilful and malicious desertion on her part. In the opinion, written for this court by RHODES, J., the pertinent authorities are all cited and reviewed and the conclusion reached that the libellant had failed to meet the burden of proving by a preponderance of evidence a wilful and malicious desertion, without reasonable cause, on the part of the respondent.

In the course of his opinion the master remarked, "It is fair to infer that there never can be a resumption of the marital status between the libellant and respondent." We are not prepared to agree with that view. During the course of the hearings, appellant, after testifying to the circumstances of the interview, said she would not refuse to live with libellant if she "thought he was sincere," and stated, in response to a question by the master, that she still regarded herself "as being his wife." The master then asked, "If your husband offered to return to you today to take you back would you go back to live with him?" Her answer was, "Yes, I think it is my place." We find no indication in the record of hostility upon the part of appellant toward libellant. Although we have not had the advantage of seeing and hearing the parties, it seems to us quite probable that if libellant would provide a home in accordance with his means and convenient to his business and approach appellant normally and sincerely this marriage could be saved and a proper home life restored for the boy and his parents. This, however, is a matter for the parties to determine for themselves. Our sole function and duty is to decide whether appellant has been convicted by the fair weight of the evidence of having wilfully and maliciously deserted her husband and persisted therein for a space of two years. For the reasons above stated, a majority of our members are convinced she has not.

Decree reversed and libel dismissed at costs of appellee.