Jones *v.* Jones, Appellant.

Argued November 21, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*James A. Cochrane,* for appellant.

*James L. Rankin,* of *Geary & Rankin,* for appellee.

OPINION BY CUNNINGHAM, J., April 18, 1941:

In this proceeding instituted under Section 11 of "The Divorce Law" of May 2, 1929, P. L. 1237, 23 PS §11, a wife sought and obtained in the court below a divorce from bed and board, with alimony at the rate of $12.25 per week, upon the grounds of "malicious abandonment" by her husband and "such indignities to her person as to render her condition intolerable and life burdensome." In the absence of a jury trial, we are required, upon this appeal by the husband, to reach an independent conclusion upon the merits of the decree from our own review of the evidence, using, merely in an advisory capacity, the comprehensive report of the master, who saw and heard the parties and their witnesses.

In the libel four grounds were assigned—malicious abandonment, cruel and barbarous treatment, indignities and adultery. As to the charge of adultery, it is sufficient to say that the young woman named as correspondent was employed along with respondent at the Scott Paper Company and that his attentions to her, which began after his separation from libellant, exceeded the bounds of ordinary friendship, but there is no evidence upon this record which would support a finding that respondent had ever committed adultery with her. Moreover, libellant conceded at the last meeting before the master (Record 482a) that, after hearing all the evidence, medical and otherwise, she

was "persuaded in [her] own mind ...... there was no adultery actually committed." The averment of cruel and barbarous treatment is also without any support in the evidence.

In his report, the master, after discussing the testimony at length and making findings therefrom, recommended the libel be dismissed; the court below, upon its independent consideration of the record, sustained libellant's exceptions to the master's report and entered a decree upon the grounds of malicious abandonment and indignities alone; this appeal by the respondent followed.

There is comparatively little conflict in the testimony relevant to the material facts; the case turns upon the inferences properly deducible therefrom.

At the time of their marriage, March 20, 1934, libellant, twenty-seven years old, was living with her parents on Huddell Avenue, Lower Chichester Township, Delaware County, and was and still is employed as a stenographer in a law office; respondent, twenty-six years of age, was living with his parents in Upper Chichester Township; his employment has, for years, been with the Scott Paper Company, where he worked every third week upon the night shift. The married life of these parties did not begin under auspicious circumstances; they never had a home of their own; each continued to reside with their respective parents; a child, born to them within three months after the ceremony, died October 21, 1936. During this period libellant wanted respondent to live with her in the home of her parents, where another married daughter and her husband also resided; he declined, but was willing to make a home for themselves apart from their parents.

On November 7, 1936, shortly after the death of the child, respondent took up his residence with libellant and her parents; that arrangement continued until December 24, 1937, when the separation which became the basis of this proceeding occurred.

As the parties lived under the same roof less than fourteen months, during which libellant asserts respondent subjected her to indignities which rendered her condition intolerable and life burdensome and at the end thereof maliciously abandoned her, attention must be centered upon that period in determining whether libellant has presented a case entitling her to a decree. Respondent, while admitting occasional quarrels about money matters and his family during which he used boisterous and profane language, denied he had engaged in any course of conduct amounting to indignities within the meaning of the statute. As to abandonment, respondent asserted that instead of having abandoned libellant she had locked 'him out of her parents' home and thrown his belongings after him.

The circumstances upon which libellant relies may be thus summarized: During most of the period respondent paid his mother-in-law $15 a week board for himself and his wife. At first they pooled their earnings; in March of 1937 respondent accused libellant of extravagance and began paying all bills himself; from October until Christmas, 1937, they again kept their money in a wallet in the bureau drawer and each withdrew ten dollars a week. Respondent's wages at the Scott Paper Company averaged around fifty dollars a week for the year 1938; prior to that they were not so high, and were the subject of 'dispute on the question of alimony. Libellant earned twenty-five dollars a week.

Libellant testified that during the months they lived together respondent frequently did not speak to her. Respondent admitted there were periods of silence, but stated they never lasted over two or three days. On cross-examination, libellant admitted their cause "was as much one as it was the other."

One Saturday evening in June, according to libellant, respondent kept her in their bedroom from 6:30 until 9:00 and forcibly restrained her every time she attempted to open the door. During the course of this

argument respondent damned libellant, told her to go to hell and said she was not fit to live. Respondent testified his wife intended to go out alone, as usual, that night and he merely restrained her in order to talk over their financial affairs and find out why they could not do things together instead of each going their separate ways. Accusations that each kicked the other out of bed, upon various occasions, were made by both parties.

Apparently the year of married life at the home of libellant's parents was entered upon under adverse circumstances and carried out more as an experiment than in a helpful spirit of cooperation and mutual understanding. Respondent stated, "She said it was only to be for one year and at the end of that year if it was unsatisfactory to her I was to leave." Libellant, herself, on cross-examination, testified, "When he came to live with me, he came with the express understanding that I was going to be first. The Joneses had been first long enough." Respondent averred that beginning in February or March of 1937 he was ordered to get out by his wife seven or eight times.

One of the chief sources of contention between the parties was the ownership and right to use a 1933 Plymouth coupe formerly owned by respondent. In October of 1937 respondent traded in a 1933 Chevrolet coupe, registered in the name of libellant's mother, on an Oldsmobile with the understanding that libellant would use the Plymouth and respondent the Oldsmobile. Respondent put off transferring title to the Plymouth to his wife until December, 1937.

In sending out their Christmas cards for 1937 libellant refused to send one to respondent's parents, whereupon respondent jumped up, beat his fists on the table and stated libellant could go to hell if she would not send a card. He also disapproved of the Christmas gifts she purchased for his family. Libellant testified: "The atmosphere was very cold for the next couple of days.

Then on Thursday, the 23d, he asked me if I was going to help wrap up his Christmas presents for him and I told him I wasn't. Then he said, 'Well, you are not going out,' and I said I was going out. He said, 'Well, you are not going out in my car.' " She went out to use the Plymouth about 7:30 that evening. He grabbed the ignition keys, pulled on the emergency brake and prevented her taking the car. Libellant then said to respondent: "Well, this is our last argument; we are done tonight; I told you that in October, that I couldn't go on living with you the way you lived, and when you go out tonight, why, you are not coming back." .

When respondent returned home from work about 5:30 in the early morning of the 24th, he found the door bolted; libellant came down but refused to let him in until he gave her title to the Plymouth or paid her $325 for it. Respondent went to the home of his parents and made another unsuccessful attempt to gain entrance to his wife's home at 7:00 o'clock. About 12:30 the same day respondent returned in an attempt to get his clothes. Libellant, returning from work, met him standing on the front porch; they walked around to the back door. Libellant, whose arms were full of packages, called to her mother not to let respondent in or open the door. In the general fracas which ensued libellant was either pushed or fell off the steps into the yard. She says respondent shoved her off the steps; he denies pushing her and says she did not fall. He accuses her of grabbing a clothes prop on a rack on the rear shed and attempting to hit him with it; libellant denies this and much of the record was cluttered up with immaterial and unnecessary testimony by the parties and their witnesses on this relatively minor issue.

Finally libellant's mother opened the door and respondent entered the house. Libellant testified: "Then I went upstairs and I took his clothes from the drawers and threw them down the stairs and he picked them up

and went out." Later, following a communication from respondent's attorney, libellant got the title to the Plymouth car and gave respondent the remainder of his clothes.

We think the testimony by and on behalf of libellant falls far short of establishing a course of conduct upon the part of respondent which amounted to "indignities" within the meaning of the statute as construed in our numerous decisions. This marriage never did rest upon a sound basis and each party seems to have been about equally responsible for the bickerings and quarrels which were largely attributable to the circumstances under which they tried to live together. In the language of libellant's mother, upon cross-examination, "One was just as contrary as the other." The proof essential to support a divorce from bed and board must be as clearly established as in an application for absolute divorce: *Arnold v. Arnold,* 128 Pa. Superior Ct. 423, 424, 194 A. 229. The burden is upon libellant to make out a case by clear and satisfactory proofs, the evidence must preponderate in her favor: *LaClair v. LaClair,* 128 Pa. Superior Ct. 469, 471, 194 A. 224; *Putt v. Putt,* 118 Pa. Superior Ct. 74, 180 A. 92. As stated in our recent case of *Mentser v. Mentser,* 136 Pa. Superior Ct. 582, 589, 7 A. 2d 541: "Where such a charge is made the law contemplates a course of conduct or continued treatment, not single acts separated by long intervals of time. Slight altercations, incompatibility, or temporary irritation are, as stated in *Knox v. Knox,* 109 Pa. Superior Ct. 45, at page 48, 165 A. 769, 'too petty and trifling to justify the granting of a divorce.' As the law does not define indignities, the facts and circumstances of each case must determine ...... To sustain the charge of indignities there must be evidence from which an inference of settled hate and estrangement may be deduced (*Davidsen v. Davidsen,* [127 Pa. Superior Ct. 138, p. 142]; *Huston v. Huston,* 130 Pa. Superior Ct. 501, p. 513)."

Upon the charge of malicious abandonment the weight of the evidence is clearly against libellant's contention. With the exception that it need not be persisted in for any specified period of time, malicious abandonment as a ground for divorce from bed and board at the suit of the wife is, in many respects, analogous to wilful and malicious desertion where an absolute divorce is sought. As President Judge KELLER stated in *Semmens v. Semmens,* 136 Pa. Superior Ct. 377, 379, 7 A. 2d 530: "While the cause alleged in the libel, pursuant to the statute authorizing a divorce from bed and board, to wit, 'that respondent had maliciously abandoned his family,' is not exactly the same as the 'wilful and malicious desertion' for which a divorce from the bonds of matrimony may be granted, it is the practical equivalent of the latter, and is certainly no less severe in its requirements, and is to be applied no less strictly."

Here, libellant locked her husband out of the house which was then their common domicile. His return to the home of his parents was certainly not a malicious abandonment of his wife, unless his previous conduct amounted to such indignities as justified her in turning him out. As we have already seen, no such justification was shown.

Considerable stress was laid by counsel for libellant and by the court below upon certain events following the separation of the parties on December 24, 1937, apparently upon the theory that the refusal by respondent of an alleged offer upon the part of libellant to resume cohabitation with him amounted to some sort of a constructive abandonment.

Some seven months after the separation respondent instituted proceedings for an absolute divorce from libellant upon the ground of indignities; she decided to contest the application but after the case had proceeded to the point of an application for the fixing of alimony pendente lite and counsel fees, the husband abandoned the proceeding, thereby conceding his continuing liabil-

ity to contribute, within the established limitations, to the support of libellant.

By October 12, 1938, both parties had engaged counsel. On that date, at a conference arranged in the office of libellant's attorney, the latter asked respondent to provide a separate home for his wife on the condition that he would arrange to take her to her mother's so she would not have to sleep alone when respondent was working on night work. Respondent declined to accept this suggestion because "it was not a separate home where she could be with [him] at all times."

Libellant later called respondent on the telephone and arranged to meet him at the corner of Laughead and Huddell Avenues on the evening of October 26, 1938. They talked for several hours but were unable to reach any agreement to live together again. Respondent refused to try a separate home unless libellant would quit her work immediately; libellant was unwilling to give up her employment without assurance that her future happiness would be secure.

The final alleged offer by libellant to resume marital relations occurred the evening of November 5, 1938, when she drove over and met respondent in front of the Jones' home, stating to him: "I can see the things I said to you last Wednesday night have meant nothing, so I am saying to you now I am going to give you one week to make a home for me and, if not, I am going to sue you for support ......"; respondent replied: "Go ahead."

The good faith of these offers of reconciliation may well be doubted. Under the circumstances of their separation it was incumbent upon libellant to take in good faith some unequivocal step looking toward a resumption of their marriage relations: *Semmens v. Semmens*, supra. It was essential that the offers be made in sincerity and not merely for the purpose of laying a foundation for an action, and the burden was on libellant to establish good faith: *Walsh v. Walsh*, 117

Pa. Superior Ct. 579, 178 A. 399; *Peters v. Peters,* 138 Pa. Superior Ct. 534, 10 A. 2d 867. All the surrounding circumstances must be taken into consideration: *Michell v. Michell,* 134 Pa. Superior Ct. 230, 3 A. 2d 955.

None of libellant's offers in the case at bar was made until almost a year after she had locked respondent out and only after he had himself applied for a divorce. They were noticeably lacking in frankness and were more in the nature of statements of conditions, demands and threats. It would be difficult to conclude, under all the circumstances, that they were made with an honest desire and hope they would be accepted.

Considering the record as a whole, it is apparent respondent has been guilty of conduct which is far from commendable, but we are unable to conclude libellant has shown such conduct upon his part as entitles her to the decree entered in her favor by the court below.

Decree reversed and libel dismissed.