## Leslie, Appellant, *v.* Leslie.

Argued March 11, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Zeno Fritz,* for appellant.

*Norman Landy,* with him *Norman Paul Wolken,* and *Wolken & Landy,* for appellee.

OPINION BY WATKINS, J., June 11, 1957:

These appeals are from a decree of the Court of Common Pleas of Allegheny County, dismissing exceptions filed by the appellant wife to a master's report recommending the grant of an absolute divorce to the appellee husband, on the ground of indignities, and the dismissal of the appellant wife's action for divorce from bed and board on the grounds of, (1) cruel and barbarous treatment; (2) indignities to the person.

Both cases were heard simultaneously before the same master. The parties were married on February 2, 1945, while the husband was in military service. The husband, at the time of the hearing, was 36 years of age, the wife 35. There is one child of the marriage, a boy, born March 22, 1947. He resides with his mother. The husband, at the time of the hearing, was a taxi-driver but during his marriage, and prior thereto, was a funeral director.

The wife knew of his occupation as a funeral director at the time of their marriage and made no objection to it. After his return from military service, three years after the marriage, they resided with the husband's parents for one year and three months. The wife could not get along with her husband's parents and constantly criticized his occupation as a funeral director, stating that all he did was "sit around waiting for people to die." Finally, acceding to her pressure, he gave up the funeral business and sought employment elsewhere. He took any kind of job available, indicating his desire to meet his wife's objections, both to his business and his family. This is indicated by his acceptance of a job as bartender in Frankenmuth, Michigan, and the fact that, at the time of the hearing, he was working as a taxi-driver.

The family lived together in Frankenmuth, Michigan when the appellee husband reenlisted in the U. S.

Air Force, and then the parties lived at Rapid City, South Dakota. In 1950, the husband received a discharge. His father having died, the appellee returned his family to 721 Brushton Avenue, Pittsburgh. This time, however, they occupied the entire home, the appellee's family having moved out.

Despite the fact that the husband's family were no longer present she continued her course of conduct of ridicule and abuse. She insisted on having the child, then three years old, share their bed and sleep between them; and finally, in the spring of 1952, forced the appellee to sleep in a separate bedroom.

The record shows that the appellant, in the presence of others, referred to the appellee as "the great one" and the "big shot". When questioned, she said she thought the terms appropriate. She called him a "vulture" because he was a funeral director; that he played on other people's sorrow; ridiculed his membership in the masonic order, calling it a "cloak and dagger" organization. She continually upbraided him about their difference in religion and claimed they were not married because they had not been married by a catholic priest. She refused to have any more children, although there was no physical reason for this decision. She called the appellee a "thief" and a "liar" in the presence of members of his family.

This course of conduct was continuous from a time shortly after their marriage, until March 8, 1953, when the appellee left his home. From September 1951, until March 8, 1953, appellant refused to eat meals with her husband and refused to permit the child to have his meals with the appellee.

She told him she would ruin his business and his entire family and while he was in the funeral business did everything possible to accomplish her threat by refusing to answer business telephone calls; cut off the

heat in the home; and by her actions discouraged business callers and hurt his hope of prospective business.

The appellee testified that on one occasion the appellant threw a chair at him and tried to hit him with her purse, and at another time she kicked him in the privates.

The lower court made a very careful analysis of the testimony and we quote with approval the following portions of the opinion of Judge WEISS. "In reviewing the report of the Master in these cases, this court has given detailed consideration to all the testimony presented in behalf of both parties and to the briefs and arguments of counsel on the exceptions filed. Although the Master's report does not specifically set forth his findings of fact in consecutively numbered paragraphs as is ordinarily done in these cases, a review of the entire report discloses that specific findings of fact were made throughout the Master's report so that both the parties and the court are adequately apprised of those findings upon which the Master bases his conclusion of law. It is the opinion of the court that the findings, conclusions, and recommendations of the Master in these proceedings are supported by the evidence and are in accordance with the applicable law. . . This court concurs in the conclusion of the Master that the entire course of the defendant's conduct, as placed in evidence by the plaintiff and as corroborated by the defendant herself, was such as to evidence settled hate and estrangement on the part of the defendant. In support of such a conclusion the report of the Master states on page 10 of his report: 'Further, defendant's demeanor on and off the stand, in the hearing room (especially during plaintiff's testimony) was such as to bring words of caution from the Master and such as to plainly reveal her contempt and disdain for plaintiff. She displayed in the hearing room itself intentional in-

civility, manifest disdain and malignant ridicule of her husband, and her answers prove her guilty of like conduct in the past to the extent that plaintiff was required to secure medical treatment for a nervous condition and to leave the common abode in March 1952 to become a cab driver.'

"The Master further found that the plaintiff's testimony was forthright and erect and that the defendant was either evasive, vague, or contradictory or clearly revealing of her disdain for her husband. Under such circumstances, this court is inclined to give considerable weight to the observations of the Master during the course of the hearing. He was able throughout the proceedings to observe and study the behavior of both of the parties and their demeanor on and off the witness stand; many times such observations may well be more convincing and persuasive in drawing conclusions from the evidence than the actual testimony of the parties themselves. . . . However, it is appropriate at this time to consider briefly the testimony of the defendant relating to certain indignities alleged to have been committed by the plaintiff. Defendant testified that the plaintiff called her a 'bitch,' a 'slut,' a 'chippy,' a 'stupid moron,' but she did not state when or how many times, or in the presence of whom, if anyone, the alleged name calling took place. She complained that her husband accused her of going into bar rooms, but then admitted that she and her girl friends did stop into a bar on several occasions. Even though she admitted that the plaintiff had never hit her, she further testified that he tried to choke her 'at least twice and knocked her down.' In one instance she testified that the plaintiff knocked her down the steps of their home while she was attempting to retrieve some packages which had been delivered from a local department store, and which the husband had picked

up with the intention of returning them to the store. On this point she testified 'he had them (the packages) in his possession and he started to take them upstairs, and I tried to get them away from him. He knocked me down the steps.' But then she explained, 'I didn't actually fall. I caught myself. Then he went up to the top of the stairs and he went into the office, which was at the top of the stairs and laid the packages down and he made a call to Gimbels at that time. I took the packages over in my room and put them under the bed. Then I went down stairs.' She admitted that it was while she was trying to retrieve the packages that they engaged in a 'wrestling match.' It is difficult to believe that if the plaintiff had actually tried to choke her and put her in fear of her life, she would have continued to use force to retrieve the packages, or that she would regard such an action as a mere 'wrestling match.' Her testimony on this point is unconvincing as it represents more of a description of the physical byplay in connection with the struggle for the package than it does an act of violence directed against her.

"Another incident occurred when the plaintiff attempted to take his son on a business trip with him and the defendant refused to allow this for the reason that the son had to attend a morning kindergarten session. However, in accordance with the Master's conclusions, the court is of the opinion that her version of the incident indicates that she was the provoking party. Plaintiff did testify that he did use some force against the defendant to ward off her own physical attack after she had kicked him. Defendant further testified as to another choking incident, but her own testimony reveals that she was the provoking party and the testimony itself indicates that she considered the incident lightly.

"It has long been the law in Pennsylvania that conduct provoked by a spouse cannot be relied upon in

making out a case of indignities against the other spouse. In *Harding v. Harding,* 156 Pa. Superior Ct. 438, the court observes: '. . . if the alleged indignities were provoked by the complaining party, they are not grounds for divorce, unless when the retaliation is excessive . . . : and that means, established to be excessive by clear and satisfactory evidence. Daly v. Daly, supra, at page 404. See Hill v. Hill, 57 Pa. Superior Ct. 1, 7; Scott v. Scott, 135 Pa. Superior Ct. 505; Rausch v. Rausch, supra.'

"Certainly, the instances relied upon by the defendant to establish indignities on the part of the plaintiff, even if true, are not sufficient to constitute indignities under the law. Moreover, an analysis of the defendant's testimony on these points discloses that it is indefinite and unconvincing, since the action of defendant on these occasions were not consistent with the actions of the reasonable person under the same circumstances. Had the defendant considered these incidents as seriously as she now contends, she would not have taken them so lightly at the time. Nor is this court of the opinion that the incidents complained of by the defendant, especially those incidents wherein she claims that she was choked by the plaintiff, of such a nature are as to deny the plaintiff the status of the 'innocent and injured spouse.' It would appear that such incidents as previously discussed were provoked by the defendant and were not sufficient in number, duration, or severity to deny the plaintiff his divorce."

In this case the master and the court below carefully pointed out that their findings were largely based upon the credibility given to the testimony of the appellee and their lack of confidence in the testimony of the appellant based upon her demeanor and actions when she appeared before the master as a witness.

"The master's report, although advisory only, is to be given the fullest consideration as regards the credibility of witnesses whom he has seen and heard, and in this respect his report should not be lightly disregarded. . . . However, the master's advantage obtained through seeing and hearing the witnesses exists only where the findings depend upon the credibility of witnesses." *Boyer v. Boyer*, 183 Pa. Superior Ct. 260, at page 263, 130 A. 2d 265.

"Indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement." *McKrell v. McKrell*, 352 Pa. 173, 42 A. 2d 609 (1945).

It is our opinion that the appellee met the burden of establishing, by a preponderance of evidence, that his wife offered such indignities to the person as to render his condition intolerable and life burdensome; that he is the innocent spouse and he is entitled to a divorce. It is further our opinion that the testimony submitted in behalf of the appellant in support of her case for indignities is in itself not sufficient to establish a case of indignities and certainly falls short of establishing cruel and barbarous treatment on the part of the appellee.

The decree is affirmed.