## Sims *v.* Sims, Appellant.

440

Argued November 11, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, ERVIN, and WATKINS, JJ. (WOODSIDE, J., absent).

*Patrick J. Corr,* for appellant.

*A. Morris Ginsburg,* for appellee.

OPINION BY RHODES, P. J., March 18, 1959:

The husband-plaintiff instituted an action for absolute divorce against his wife, Mary M. Sims, on August 30, 1955, and in his complaint he alleged indignities to the person. On November 5, 1956, he amended his complaint to include desertion. On the latter date wife-defendant instituted a separate action seeking a divorce from bed and board on the grounds of cruel and barbarous treatment, indignities to the person, and desertion. The master appointed by the court held hearings on both actions, and recommended that a divorce be granted on the grounds of indignities and desertion as alleged in plaintiff's complaints. In the wife's separate action for a divorce a mensa et thoro the master found against her on all grounds and recommended that her complaint be dismissed.

The wife filed exceptions to the master's report in which she alleged that the master erred in failing to make detailed findings of fact and in his conclusions of law. With leave of court the master filed additional findings of fact. The court in banc, in an opinion by Judge SOFFEL, overruled the wife's exceptions, approved the master's report, and entered a decree in favor of plaintiff on the grounds of indignities and desertion in his action for an absolute divorce. The court of common pleas also accepted the recommendation of the master in the suit of Mary M. Sims v. Fred J. Sims (No. 212, April Term, 1958) for a divorce a mensa et thoro and dismissed her complaint. The wife has appealed from both decrees.

The parties were married in a civil ceremony on May 13, 1944; their one child is a daughter. Plaintiff,

his brothers and sisters had been raised in a Catholic family; but plaintiff testified that he was a Protestant. Later, on September 3, 1944, a religious ceremony was performed by a priest of the Catholic church. At this ceremony plaintiff was advised to take religious instruction; he stated, however, that he had no intention of joining that church. Thereafter the wife continually berated him for his failure to join the church, nagged him, and refused him normal relations; in fact, she would have nothing to do with him. In this connection she demanded that plaintiff drop his membership in the Odd Fellows Lodge because she considered it a Protestant organization.

Many of the indignities alleged to have been suffered by plaintiff grew out of his wife's refusal to leave the home of her parents and establish a home of their own. From the time of the marriage in 1944 until the final separation on June 25, 1954, the parties lived with the wife's parents, which obviously created an intolerable condition.

At first plaintiff was employed as a printer in Washington, Pennsylvania, and commuted week-ends to the home of the wife's parents in Pittsburgh. In July, 1947, plaintiff obtained employment with the Pittsburgh Press and thereafter lived continuously with the wife's parents in the latters' home until the final separation. She had an allowance of $25 per week when plaintiff was working in Washington, Pennsylvania, and $40 or more when he was working in Pittsburgh. Although plaintiff made repeated efforts to establish a home of his own, she emphatically refused to leave her parents. Plaintiff listed addresses of prospective homes which he visited but which his wife refused to consider.

In addition to the wife's conduct arising from diverse religious views, plaintiff testified to violent dis-

putes growing out of political differences. The wife's father worked for the County of Allegheny and was active in local politics as a Democrat. Plaintiff was registered as a Republican. He testified that his wife continually nagged him about his registration until he finally was forced to change it to keep peace in the family. She testified: "Well, as he said, under fire he had to do it." On another occasion she annoyed plaintiff until he wrote letters for his father-in-law, who was apparently unlettered, for use in a local political campaign, supporting a candidate opposite to plaintiff's choice. Notwithstanding plaintiff was subsequently designated a "dirty turncoat" by his wife's family.

Some time in 1954 the wife purchased for herself a new bedroom suite. Immediately thereafter the wife demanded that plaintiff sleep in the attic, where he was required to sleep until the final separation on June 25, 1954. Plaintiff testified that his wife and her family were insolent and repeatedly called him names, and that she used vile language in reference to their child when the little girl was ill. In his wife's presence her father was abusive and threatened plaintiff. To avoid controversy he was obliged to eat his meals away from home. Moreover, he mended his own clothes. His domestic troubles affected his health for which he received medical treatment.

Plaintiff stated he was finally forced from the home of his wife's parents on June 25, 1954, under the following circumstances. Plaintiff on that occasion came into the kitchen about 4 p.m. and picked up a yardstick which his daughter had thrown on the floor. Apparently this had incensed his father-in-law, Patrick Holleran, who was attempting to discipline the child. As plaintiff reached down to pick up the yardstick, Mr. Holleran pushed plaintiff to the floor, and finally

struck plaintiff in the mouth and eyes. Plaintiff testified: "When I tried to get up he would just hang over me and push me down again. So I gave him a push and he fell into the kitchen. . . . When I turned around that is when he hit me in the nose. It started to bleed and I went over to the sink to let the blood run in the sink. . . . Just as I turned around he hit me in the eye. Then my wife come in from next door. . . He said 'Come on out in the yard. I will kill you.' . . . She said, 'I am going to call No. 12 and get him thrown the hell out of here.' " As a result the wife called the police who came and told plaintiff to get out immediately. The wife and her family joined in demanding that he get out at once and take his belongings with him. Plaintiff called his brother who came and took plaintiff away in his car. The brother corroborated the fact that plaintiff was at this time visibly disturbed. His eyes were black and his nose was bleeding. The next day plaintiff and the brother returned and removed plaintiff's clothes and belongings. At that time, according to plaintiff's brother, the father-in-law showed no effect of any alleged injury from the day before.

The wife testified in her own behalf, and while denying plaintiff's allegations in various particulars she did not deny the essentials in many instances. She admitted that she continually urged plaintiff to become active in the Catholic faith. She admitted that plaintiff finally changed his political registration under fire and to keep peace in the family. Regarding the climactic incident of June 25, 1954, she testified that she came into the kitchen from the store next door, saw her father on the floor, and concluded that her husband had knocked him down. She did not hide the fact that in this incident she made no inquiry to determine what had occurred, but sided unhesitatingly with her father against her husband, and stated, on cross-examination,

"I certainly did. Why shouldn't I?" Likewise, she admitted calling the police who ordered plaintiff out of the house, in which she and her father joined. Even thereafter he asked her to establish a separate home with their child, and each time she refused and stated, according to plaintiff, "To hell with you. I am staying right where I am at."

Upon reading the testimony we are led to agree fully with Judge SOFFEL: ". . . from a review of defendant's own statements, she clearly showed her general hate, disregard and disrespect for the plaintiff and on her own testimony stated that life for the last three years had been a living hell, and thus indicated that their life together had become burdensome and intolerable." Thus, much of her testimony is not contradictory of plaintiff's charges, but rather constitutes attempts to justify her conduct toward her husband. The offense of indignities to the person "is complete when a continued and persistent course of conduct demonstrates that the love and affection upon which the matrimonial status rests has been permanently replaced by hatred and estrangement." Boyer v. Boyer, 183 Pa. Superior Ct. 260, 271, 130 A. 2d 265, 270.

The report of the master who saw and heard the witnesses is ordinarily entitled to the fullest consideration where, as here, credibility is in issue and the master's findings dependent thereon are not at variance with the record. Rankin v. Rankin, 181 Pa. Superior Ct. 414, 418, 124 A. 2d 639; Barnes v. Barnes, 181 Pa. Superior Ct. 427, 437, 124 A. 2d 646; Boyer v. Boyer, supra, 183 Pa. Superior Ct. 260, 263, 130 A. 2d 265. This is not a case where a plaintiff's uncorroborated testimony is denied and shaken by the defendant. Cf. Hansell v. Hansell, 182 Pa. Superior Ct. 158, 160, 126 A. 2d 509. While the wife may have produced a greater number of witnesses, their testimony was general and

did not add anything substantial to the testimony of the parties. Plaintiff in our opinion met the burden of proof resting upon him and showed a course of conduct rendering his condition intolerable and life burdensome. Cf. *Buckley v. Buckley*, 184 Pa. Superior Ct. 465, 469, 135 A. 2d 791.

As to the charge of desertion, we also agree with the conclusion of the master, who saw and heard the witnesses, on the issue of credibility and as to whether plaintiff was put in fear by the conduct of the wife, her father, and the police in forcing him out of the home of his wife's parents where he and his wife had resided since their marriage. See *Zorn v. Zorn*, 382 Pa. 319, 114 A. 2d 907. It is significant that the wife at all times refused to leave her parents' home from which he was forced by their combined action. Her intent to live apart from her husband is manifest. The circumstances justified a conclusion that he would be in danger of bodily harm if he attempted to return to live in her parents' home. *Foley v. Foley*, 188 Pa. Superior Ct. 292, 146 A. 2d 328.

In the wife's action for a divorce from bed and board it is clear that her charge of cruel and barbarous treatment was not established; neither was the charge of indignities. While it is true that there is no requirement that a wife, suing for divorce a mensa et thoro because of indignities, must be the injured and innocent spouse (*Wick v. Wick*, 352 Pa. 25, 42 A. 2d 76; *Hurley v. Hurley*, 180 Pa. Superior Ct. 364, 373, 119 A. 2d 634), the wife's proofs in the present action fell far short of establishing indignities on the part of the husband.

Finally, it is equally clear that the wife's allegation of malicious abandonment on the part of the husband in her action for divorce a mensa et thoro was not proved. Malicious abandonment (23 PS §11) as a

ground for divorce from bed and board at the suit of the wife is analogous to, and the practical equivalent of, willful and malicious desertion where an absolute divorce is sought, and in both actions clear and satisfactory proof is required. *Jones v. Jones*, 144 Pa. Superior Ct. 372, 379, 19 A. 2d 480; *Bruno v. Bruno*, 185 Pa. Superior Ct. 219, 222, 138 A. 2d 301. As we have said, the proof required in an action for divorce from bed and board must be as clearly established as in an action for absolute divorce. *Jones v. Jones*, supra, 144 Pa. Superior Ct. 372, 378, 19 A. 2d 480.

It is our opinion that the evidence established the grounds alleged by husband-plaintiff, that he is entitled to a decree in divorce on such grounds, and that the wife in her action against her husband for a divorce from bed and board did not produce proof entitling her to a decree. Cf. *Leslie v. Leslie*, 184 Pa. Superior Ct. 18, 132 A. 2d 379.

The decree of the court below granting a divorce a vinculo matrimonii to husband-plaintiff in No. 211, April Term, 1958, is affirmed.

The decree of the court below dismissing the complaint of wife-plaintiff for divorce a mensa et thoro in No. 212, April Term, 1958, is affirmed.