## Kolopen *v.* Kolopen, Appellant.

Argued December 9, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-FELD, RHODES, HIRT and KENWORTHEY, JJ.

*Raymond L. Brennan,* for appellant.

*Leon N. Mandell,* for appellee.

OPINION BY KELLER, P. J., April 14, 1942:

This was an action of divorce brought by a husband, John Kolopen, against his wife, Victoria Kolopen; on the grounds (1) that by cruel and barbarous treatment she had endangered his life; and (2) that she had offered such indignities to his person as to render his condition intolerable and life burdensome. The parties were married November 27, 1933, when the husband was nearly 26 years old and the wife was 22 years old. There were no children.

The master recommended a divorce on the ground of

personal indignities, holding that the evidence did not support the charge of cruel and barbarous treatment. The court dismissed the exceptions filed by the respondent, approved the report and recommendations of the master and granted libellant a decree of divorce on the ground of indignities to the person. The respondent appealed.

We have carefully read the testimony in the record, and disregarding, for the present, the words put in the mouth of the libellant by the leading questions, persistently indulged in, of the counsel for libellant and the master, we find no basis whatever for the findings of the master relied on to support this decree. The testimony of the libellant, unassisted by the words put in his mouth by counsel and master, presented the flimsiest of bases for a divorce on the ground of personal indignities, and none whatever for cruel and barbarous treatment.

The master seems to have had little or no conception of his duties. A master occupies, for the time being, a quasi judicial position, which requires as strict impartiality on his part as if he were a judge hearing the case. If, under the local rules of court, his examination of witnesses goes beyond inquiries as to the residence of the parties, so as to determine the jurisdiction of the court, and whether there is any collusion between the parties in securing a divorce, it should be absolutely impartial. It is no part of his duty to make out a case for the libellant, or help out the latter's testimony by asking him leading questions. The *re-examination* by the master of the libellant (pp. 71-80), after his own first examination, the examination by libellant's counsel, and the cross-examination by respondent's counsel, was wholly without justification, and seems like an attempt, by leading questions, based on, but unsupported by, libellant's prior testimony, to make out a case warranting a decree.

The findings of fact on which the master based his

recommendation for a decree of divorce may be summarized as follows:

(1) The respondent did consistently and repeatedly nag the libellant.

(2) The respondent did consistently and repeatedly charge the libellant with improper relations with other women.

(3) The respondent did consistently and repeatedly accuse the libellant of infidelity.

(4) The respondent did call the libellant vile names and did use abusive language to him.

(5) The respondent, by her conduct, acts, and words, did manifest a settled hate and estrangement.

(6) That these actions constituted a course of conduct on the part of the respondent, and were without any justification in the actions of the libellant.

A careful review of all the testimony leads us to the conclusion that none of them is supported by the competent, credible evidence.

The only testimony for the libellant was given by himself and his mother. The libellant's testimony was replete with hearsay declarations of other people, none of whom was called to substantiate him. The mother could, with difficulty, speak English, and her testimony did not establish any of the above findings.

'Nagging' is a very general and indefinite term. A libellant must go further than say she 'nagged' him. If to 'nag' means, in common acceptation, "to annoy by petty fault finding or persistent scolding or urging" (Webster), or "to be persistently worrying or irritating by continued fault-finding, scolding or urging" (Oxford Shorter), it is the libellant's burden to give specific instances of a course of conduct which falls within those definitions. The testimony of the libellant signally failed in this respect.

Nor is there anything in the libellant's testimony, unaided by the words put in his mouth by leading questions of his counsel and the master, based on unsup-

ported deductions from his prior testimony, that supports a finding that the respondent ever charged him with improper relations with other women or accused him of infidelity. To deduce these charges from what he had testified to is drawing a wholly unwarranted conclusion.

A man may have an appreciative eye for a good-looking woman without having improper relations with her or other women, or being guilty of infidelity; and a suggestion that he has such an eye for other women is not a charge of criminal misconduct.

When the respondent was told by friends that her husband had been in the company of other women, an inquiry on her part as to where he had been and who was with him was not a charge of improper relations or an accusation of infidelity; and much of her questioning on this score would have been avoided if he had come home at a reasonable hour and not persistently stayed out until late at night or early in the morning. So, too, the circumstance of her dismissal of the girl who assisted her in the confectionery store which she carried on for about four years, while he was working as a tailor, does not support the conclusion of the master that she accused libellant of improper relations with her. The respondent worked in this store from 8:00 A.M. to 11:30 P.M. When the libellant came to the store about 6:00 P.M. and stayed there until 8:00 P.M., he used to assist this girl at washing the dishes and doing her other work, but he never helped his *wife* at these same tasks, and, as she testified, it 'burned' her up, and she discharged the girl; but she had made no charge of improper relations between the girl and the libellant. It was the latter, who testified on this score: "When this girl was going out the door, she says: 'Mrs. Kolopen, I know you didn't like me from the very beginning, but John [Mr. Kolopen] likes me' ". It was this that caused the 'bawling out' which he said he then got. The respondent had a

right to complain if her husband treated girl employees with more solicitude than he did his wife.

Other occurrences relied on have even less substance as ground for divorce. The libellant testified that for a time he took his wife to the movies in the evening about once a week; and that at such times she told him to go with her as he was, without dressing up or shaving; that she said: "It is good enough for me. We are just going to the movies. Just put your top coat over the leather jacket. It is good enough for me." (p. 9, 10). To cite this as an instance of nagging or accusing him of running after other women is ridiculous.

So, too, he complained that she insisted on selling the confectionery store at a loss, because she was tired and wanted to sit on her front porch. We can well believe that she was tired after four years of working from 8:00 A.M. to 11:30 P.M., but she said her real reason for selling when she did was that the building had been put on the market for sale, and as she had been compelled to move once before at a loss, she took a purchaser for the business rather than move again.

We find no credible evidence that the respondent called the libellant vile names or was accustomed to use abusive language to him.

Her letter to the libellant written during the October following the separation in June, 1939, so far from being an admission of any wrongdoing on her part, *justifying a divorce,* was rather an attempt at a reconciliation and showed her kindly feeling and affection for him instead of any settled hate and estrangement. It is significant that from June 1, 1939, the time he left the home of his parents, (with whom libellant and respondent had lived since 1934), which leaving was followed several days later by her going to her mother's, he never made the slightest move to see her, write her, or attempt a reconciliation.

The testimony of the respondent, in our view, so far

from being evasive was frank, and, to us, seems truthful. She admitted doing some things that she was sorry for, but none of these things justified this decree. She had considerable cause for complaint. During all the years of their married life, he bought her no clothes, and while he had time and money, to go out by himself, was unwilling to spend either time or money on her. She was badly hurt in December 1937, by being hit by an automobile as she was walking across the street, resulting in a concussion of the brain, and the after effects of this accident on her nerves and general health must be considered in connection with her conduct from then until June 1939.

Furthermore the libellant's testimony fails to show any alleged conduct by his wife, humiliating to him, which occurred in the presence of other people.

One significant matter, which counsel for libellant insisted on putting in the record, appears in the notes of testimony, p. 61:

"Q. Prior to the time you were married and during the three months that you knew your wife, will you tell us how it came about that you were married?

"A. I was going with her, I guess, about two months, and I said one night, 'Let's get married'. So then after it she says, 'Well, let's get married then.' And so I said, 'Well, next month.' And when next month came around she said, 'Are we getting married this month?' And I said, 'Wait till next month', I said, 'I don't have any money saved.' And she says, 'We don't need no money. We will live with my father and mother, and we will pay half of what it costs to run the home.' I said, 'Well, let it go yet for awhile.' She says, 'Yes. Last month you said next month.' And then it sort of struck me funny. I said, 'Listen. What is your big hurry getting married like that?' I said, 'If there is anything wrong with you, you come right out now, because,' I said, 'don't think I am going to live with you just to cover somebody else's troubles,' I said, 'all

right'. She said, 'No, there is nothing wrong with me.' And finally I listened to her and got married." That seems to us a typical reaction on the part of the libellant to respondent's acceptance of *his proposal of marriage* and of *his own suggestion* as to the *time for the wedding,* and sheds some light on his attitude towards his wife.

Without entering into further discussion of the matter, we find that the credible evidence in the record does not sustain the 10th, 11th, 12th, 13th, 15th, 16th, 17th, 18th, 19th, 22d, 36th, 37th and 38th findings of fact of the master, nor support the decree of divorce. The first, second and third assignments of error are sustained. The decree of divorce is reversed and the libel is dismissed at the costs of the appellee, the libellant.