## Copeland *v.* Copeland, Appellant.

Argued April 19, 1944. Before KELLER, P. J., BALDRIGE, RHODES, HIRT, KENWORTHEY, RENO and JAMES, JJ.

*Carroll Caruthers,* with him *Frank A. Rugh,* for appellant.

*Robert W. Smith, Jr.,* of *Smith, Best and Horn,* with him *Edward G. Bauer* and *John W. Pollins,* for appellee.

OPINION BY KELLER, P. J., July 15, 1944:
The husband's libel, filed January 7, 1938, charged

his wife with having deserted him on July 1, 1932, and averred that she had "committed wilful and malicious desertion and absence from the habitation of the injured and innocent spouse without reasonable cause, for and during the space of two years."

The wife's answer denied any wilful and malicious desertion by her of the libellant.

The master, by accepting as verity all the testimony of the libellant and disregarding the testimony of the respondent and her witnesses, found a constructive desertion of the libellant by the respondent and recommended that a decree of divorce be granted; and the court below (KEENAN, P. J.) followed his recommendation and granted the divorce. Respondent appealed.

A careful reading of the evidence in the record leads us to disagree with the master and the court below. We find no actual wilful and malicious desertion of the libellant by the respondent, nor any conduct that will justify a finding of *constructive* wilful and malicious desertion.

The basis for the libellant's charge of desertion rests on the fact that on July 1, 1932 she had him arrested under the provisions of the statutes relating to 'surety of the peace'. See section 6 of the Act of March 31, 1860, P. L. 427, and the Act of March 18, 1909, P. L. 42, 19 PS §§23-26. The credible evidence in the case shown that she had good ground for this action. He had been sitting that morning in their home, as he had done a number of times before, with a loaded .45 calibre automatic pistol in his hand threatening to shoot her or someone else in the family. He was not drunk. He was not a drinking man. He was cold sober. But he was incensed at her because she was objecting, and with good reason, to his running around with another woman or women. He could have been released from jail on his giving bond with one sufficient surety conditioned to appear at the next court of quarter sessions,

and in the meantime to be of his good behavior and keep the peace toward all citizens of this commonwealth. But he either was unable or unwilling to give such bond, and remained in jail until July 6, when he was released on his signing a paper prepared by the justice of the peace, of his own motion, as follows:

"Jeannette, Pa./July 6th, 1932. To whom it may concern.

"I, John Copeland hereby agree to stay away from the home of my wife and not to cause her or my family any trouble from this date on. John Copeland (Seal).

Witness. Edward A. Egan [Justice of the Peace]."

Mrs. Copeland had not suggested this writing. Her only thought was to secure protection for herself and family against threats made by her husband, with loaded pistol in hand, when angered by her objections to his conduct with other women. And she accepted it as a means of such protection instead of the bond required by law.

From that day on John Copeland never made one move to go back to his family, which he could have done at any time that he, in good faith, stopped his philandering—to use a mild term—with the woman then involved. Instead, he expressed himself at the hearing before the master as being entirely satisfied with the separation. In the *cross-examination* of the libellant by the master, the following appears:

"Q. [by the Master] Who prepared this paper, libellant's exhibit #1 [supra]? A. Squire Egan. Q. Under what circumstances did you sign it? A. Under the circumstance I just had to sign it or come back to jail. Q. Did you and your wife agree at that time to separate and live separate and apart? A. We did. If my work picked up and I could help her I would do so. At that time there wasn't nothing doing ...... Q. Have you lived with Mrs. Copeland as her husband since July 6, 1932. A. No sir. Q. You have never stayed under same roof? A. No sir. Q. Did you and she, after

July 6, 1932, ever talk about going back together? A. No sir. Q. Both satisfied to be separated? A. Yes sir."

Nor can we agree that the summary of the court below as to his relations with this 'other woman' was a fair or adequate statement: "The husband was seen with another woman on two occasions, once seated on a bench at Oakford Park, and on another occasion, emerging from an alley[1]." His relations with this other woman were 'town talk'. Her daughter had come to the respondent and asked her to "keep my man away from her mother". The other woman's husband had beat up the libellant for his running around with the former's wife, and had him arrested for assault and battery. The children of the pair—four sons and a daughter, and the libellant admitted they were all fine children—knew of it personally and by public rumor, and all took their mother's part. Several of the older sons had spoken to their father about this woman and endeavored to get him to break off his relations with her. What those relations were may be seen from the fact that since July 1933 he has been living with her alone, adulterously.

We recognize that adultery committed by a husband after his wife has maliciously deserted him for a space of two years is not a defense to his action of divorce on that ground; but that rule does not apply here, where the *open conduct* of the husband with this woman one year after the *separation* sheds considerable light on their prior relations, and furnished a basis of justification for respondent's complaints to her husband about his running around with the other woman for at least a year prior to the separation, and her refusal to have marital relations with him for the preceding six months.

A woman who has good grounds for believing that her husband is unfaithful to her is not obliged to live

---

[1] It was a dark alley, at 10:00 o'clock at night.

with him as his wife. She may refuse to do so, and
may leave his home, without being guilty of desertion:
*Golden v. Golden,* 36 Pa. Superior Ct. 648. If the
presence of children in the home makes it impossible
for *her* to leave the home, she may refuse to occupy the
same bed with him, and she may properly complain
to him of his actions, and if he grows ugly and angry
about it and threatens her because of it she may take
steps to require him to give bond to keep the peace, and
even ask him to leave the home, without being guilty
of wilful and malicious desertion without a reasonable
cause. A woman with an adulterous husband is not
bound to live with him as his wife nor to divorce him.
To do the former would be to condone his *prior* in-
fidelity; and there is no compulsion resting on any
woman to divorce her husband, so that he may marry
the other woman. But a woman with an adulterous
husband may refuse to live with him at his home
(*Lodge's Est.,* 287 Pa. 184, 187, 134 A. 472); or she
may require him to leave her home, without being
guilty of a wilful and malicious desertion without a
reasonable cause. See *Lowe v. Lowe,* 148 Pa. Superior
Ct. 439, 443, 444, 25 A. 2d 781.

The master seemed to be of the opinion that the wife's
complaints to her husband about his running around
with other women, even though justified by the facts,
excused his actions towards her, for he asked, in an-
other of his cross-examinations—this time of the
daughter—"Q. I am willing to assume that he was run-
ning around with this woman, how did that enter into
your home, unless your mother brought it up? Did
your father come home and brag about it? A. Oh, of
course, he wouldn't. Q. Did he? A. No, I don't be-
lieve he did. Q. The subject of him and other women
was always brought up by your mother? A. Of course
these people would come and tell mother, just like
this girl. Mama would ask about it, he would say it
wasn't true, but he wouldn't stay and face the music.

Q. Would he leave? A. He certainly would, take his coat and leave. Q. If your mother, even though she heard some rumors of the misconduct on his part, hadn't nagged him about it, as she admits she did [2], it wouldn't have caused dissension in your home, would it? A. I think it would, because when Mama knew it definitely, she couldn't stand it. He wasn't satisfied to go out and leave mother alone."

The situation was explained by the sons on cross-examination as follows:

*Charles Edward Copeland*, the second son, 21 years old in 1932:

"Q. [by Mr. Bauer, counsel for libellant] When did your father admit to you that he had illicit relations with this woman? A. I didn't say that, he just went with other women. Q. He never admitted it to you? A. Not before they separated. I can't tell you the way he told me. But whenever I asked him, he told me he was with other women. I said 'if you have to go with other women, why don't you go out of town so nobody can see you?' Q. In other words, it was perfectly all right for him to go with other women, but do so out of Jeannette? A. It's not perfectly all right; if he wanted to do it, why disgrace the whole family doing it."

*Clarence David Copeland*, the eldest son, 26 years old in 1932:

"Q. [by Mr. Bauer] When did he make this statement to you about running around with women? A. Out in front of the house, when he was staying at Elias', [immediately following July 6, 1932] he came up past one day. He claimed it was mother's fault. I said, 'Well, you can't get along, you can't get away with that forever'. He said, 'I was accused of a lot of things I didn't do, *I only ran around with three women in this town.*'

---

[2] She made no such *admission*, although pressed to do so by the master.

Q. There was considerable quarreling at home for a long time? A. Yes sir. Q. It was pretty hard on your father, wasn't it? A. If you don't want it hard, you ought to behave, so you won't have it hard ...... Q. [by the Master]. Did anybody connected with your family circle make any honest efforts to patch this up and have a reconciliation? A. I have seen him with women myself and never said anything to mother. Q. Was any effort made by you children to patch things up between your father and mother after he was in jail. A. Not after he was in jail. After that happened I was through. Q. [by Mr. Rugh, counsel for respondent] Did you children try to get your father to do the right thing? A. I have talked to him. Q. Before the separation? A. Yes. I saw him with this woman when I was going to a football game one afternoon. How do you think it made me feel, I told him about it. Q. On this particular day, July 1st, had your father been raising any disturbance that day? A. Him and I got into an argument too. I told him if he ever hit mother I would wrap a poker around his neck."

We have had prior occasion to criticize masters who show their bias in favor of one of the parties in a divorce action, and said: "A master occupies, for the time being, a quasi judicial position, which requires as strict impartiality on his part as if he were a judge hearing the case. If, under the local rules of court, his examination of witnesses goes beyond inquiries as to the residence of the parties, so as to determine the jurisdiction of the court, and whether there is any collusion between the parties in securing a divorce, it should be absolutely impartial. It is no part of his duty to make out a case for the libellant, or help out the latter's testimony by asking him leading questions": *Kolopen v. Kolopen*, 148 Pa. Superior Ct. 311, 313, 25 A. 2d 569.

Although the libellant was represented by competent counsel, the master, after the libellant had been fully

examined by his counsel and had been cross-examined by respondent's counsel, devoted ten pages (pp. 18a-28a) to further cross-examination tending to help libellant's case. His eight-page cross-examination of the respondent, (pp. 50a-58a), after libellant's counsel had fully cross-examined her, showed anything but an impartial attitude on his part. So, too, his cross-examination of Mrs. Ressler, the daughter, (pp. 65a-67a), and of the son-in-law, Mr. Ressler, (pp. 85a-86a) showed his bias in favor of the libellant and against the respondent.

In our opinion the credible testimony, considered as a whole, fails to establish by clear and convincing evidence that the respondent was guilty of a constructive wilful and malicious desertion of the libellant, without reasonable cause, on July 1, 1932, or at any time since.

The fact that following the separation the court made an order against him for the support of his wife was a relevant and material fact to be considered: *Loughney v. Loughney,* 111 Pa. Superior Ct. 214, 220, 169 A. 460; *D'Alfonso v. D'Alfonso,* 138 Pa. Superior Ct. 378, 384, 10 A. 2d 808. Allocatur refused, 138 Pa. Superior Ct. xxxi. If the separation amounted to a desertion by the wife she was not entitled to an order of support against her husband.

Our action is further supported by the decisions in *Bowman's Est.,* 301 Pa. 337, 152 A. 38; *Magee v. Magee,* 71 Pa. Superior Ct. 594; *Betzko v. Betzko,* 81 Pa. Superior Ct. 231, 233.

The decree is reversed and the libel is dismissed at the costs of the libellant.