## Dash, Appellant, *v.* Dash.

Argued April 18, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

*Albert C. Richter,* for appellant.

*Harry R. Kozart,* for appellee.

OPINION BY MR. JUSTICE DREW, May 26, 1947:

Edward L. Dash, libellant, brought this action in divorce against his wife, Helen M. Dash, alleging desertion. The Master recommended a decree; the Common Pleas Court overruled her exceptions and granted a decree a vinculo matrimonii; on appeal the learned Superior Court unanimously reversed the decree of the lower court and dismissed the libel. Libellant appealed.

A divorce cannot be granted for any cause not plainly marked by statute. The Act of May 2, 1929, P. L. 1237, §10, provides inter alia as follows: ". . . that the other spouse . . . Shall have committed wilful and malicious desertion, and absence from the habitation of the injured and innocent spouse, without a reasonable cause, for and during the term and space of two years; . . ."

The parties separated and have not lived together since March 16, 1939. The question here is whether, without reasonable cause or consent, she withdrew from matrimonial cohabitation with libellant. The answer is found in an analysis of the record which determines the factual situation existing between the parties.

Where, as here, the action was heard by a master, we are obliged to make an independent investigation of the evidence in order to determine whether in truth it does establish a legal cause for divorce: *Rinoldo v. Rinoldo,*

125 Pa. Superior Ct. 323, 189 A. 566; *Nacrelli v. Nacrelli,* 288 Pa. 1, 136 A. 228. In making the review de novo we have in mind that the burden is upon libellant to prove his case by clear and satisfactory evidence, and that there must be a preponderance of the evidence in his favor or the divorce must be refused: *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69. In his report the following admission is made: "The Master has followed substantially the testimony presented by the Libellant in arriving at his recommendation in this case." We have carefully considered all the evidence and we cannot agree with the Master's findings of fact and recommendation. We think he was over-persuaded by libellant, of whose credibility we have serious doubts.

Our independent inquiry reveals the following facts: The parties were married in Philadelphia on February 11, 1929, and lived there together until January, 1937. After the marriage, Mrs. Dash, respondent, continued to work as a clerk for seven years. Their life together was without dissension until the summer of 1936 when he told her that he was in love with a girl from Germantown. However, partial harmony was restored and they moved to Mount Penn, Berks County, Pennsylvania, where they lived until the separation. Libellant admitted that in the fall of 1938 he began keeping company with a Miss Catherine Rush. He testified he was with her sometimes as often as four nights a week including Saturday nights. To explain frequent absences from home until the early hours in the morning, he kept telling his wife he was engaged those nights in business activities. He admitted giving Miss Rush a silver dresser set as a Christmas gift. He admitted spending a New Year's week-end of three days in New York with her, and said he saw no harm in this because they stayed at separate hotels. He did not inform his wife of his visit or explain his absence from home. Respondent's suspicion was completely aroused when she found in the glove compartment of his car a handkerchief smeared with

lipstick and an opened package of contraceptive devices.

Laura Kreska, a former friend of Catherine Rush, testified that on one occasion while Mrs. Dash was out of town, she and her escort had attended a party, on Mr. Dash's invitation, at his residence. During the party Mr. Dash and Miss Rush displayed many evidences of mutual affection and spent some time alone together. She testified that she had telephoned Mrs. Dash and informed her of the relationship between Mr. Dash and Miss Rush. Mrs. Dash, corroborated Miss Kreska's testimony regarding the telephone conversation, and said that she immediately went to see Catherine Rush at her home and charged her with keeping company with her husband. She testified that Miss Rush admitted the situation, but claimed she thought he was single. Mrs. Dash at once confronted her husband with his duplicity. He could not successfully deny his highly improper conduct but sought to minimize the importance of the entire matter. His own testimony shows his callous attitude. He said: "I endeavored quite naturally to calm her down and make little of the thing, because in my opinion it naturally wasn't anything so serious. There was nothing that I could see was wrong, was so bad about it."

Respondent, a few days later, insisted that he see her lawyer which he did, and then signed the following agreement of separation, dated March 7, 1939: "I, ED-WARD L. DASH, of Mt. Penn, Pennsylvania, hereby agree to pay to my wife, HELEN M. DASH, the sum of Eighty-five ($85.00) Dollars per month, payable semi-monthly, for her maintenance and support. Further, I agree to pay the storage charges for the proper safe-keeping of her furniture stored in her name, which furniture at the date hereof is located in our home."

On March 16, 1939, after libellant drove respondent to Philadelphia in his car and they had completed arrangements for the storage of the household furniture, they separated. It was admitted that in April, 1941,

they met and libellant invited respondent to live with him at the home of his parents but there was no offer made that he would stop running around with other women. Rose Trout, who was present during this meeting, testified that when Mrs. Dash asked "What will you do?" he replied "Well, I'll come and go as I please" and "You can take it or leave it." Clearly this was no honest offer of reconciliation, but was conditioned on continuing the objectionable conduct which caused the separation and respondent was fully justified in refusing to live with him under such degrading circumstances.

Libellant testified he had made several written offers of reconciliation. The only letter offered in evidence read as follows: "Helen: For God's sake, won't you please do something about the divorce?—I'm getting more and more in debt & don't know how long I'll be able to last—Please, Helen, let's be sensible—there's no use going on this way. Ed." His testimony in explanation of this letter is enough to destroy his credibility as a witness: he said: "When I wrote this letter, I distinctly meant, regardless of the way the phraseology may be construed, that if Mrs. Dash didn't come back to me, I was going to get a divorce." He did not wish to resume marital relations with his wife. He wanted a divorce and his unfaithful conduct was a means to that end.

Our review of the record has led us to a conclusion similar to that expressed in *Shore v. Shore,* 107 Pa. Superior Ct. 566, 568, 164 A. 110: "This is not a case of a husband being deserted wilfully and maliciously, but it is a case which bears every earmark of a husband grown weary of the marriage bond seeking some excuse for its dissolution . . ."

We agree with the conclusion of the learned Superior Court that "libellant's relations with one Catherine Rush were such as to lead to the fair and reasonable conclusion that they were, to say the least, not platonic." Libellant's explanation that this girl "was a friend and only a friend" is incredible. It is significant that Cath-

130

erine Rush did not testify at the hearing and that her absence was not adequately explained. Their relationship makes applicable the following statement from the opinion in *Copeland v. Copeland*, 155 Pa. Superior Ct. 102, 106, 107, 38 A. 2d 364: "A woman who has good grounds for believing that her husband is unfaithful to her is not obliged to live with him as his wife. She may refuse to do so, and may leave his home, without being guilty of desertion: Golden v. Golden, 36 Pa. Superior Ct. 648."

Respondent was fully justified in separating from libellant. She could neither maintain her self-respect nor the respect of her relatives and friends, if she continued to live with him under these circumstances. His offer of reconciliation was not in good faith. He failed to prove a wilful and malicious desertion and therefore under the statute he was not entitled to a decree.

Judgment affirmed.