## Hurley *v.* Hurley, Appellant.

Argued November 17, 1955. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

*William F. Beatty,* for appellant.

*Ella Graubart, with her Patterson, Crawford, Arensberg & Dunn,* for appellee.

OPINION BY ERVIN, J., January 17, 1956:

Jarvis B. Hurley, the defendant, has appealed from the decree of the Court of Common Pleas of Allegheny County granting a divorce a mensa et thoro to his wife, Julia Hurley, the plaintiff.

The complaint was filed on September 15, 1953 and alleged as grounds for divorce from bed and board (1) indignities to the person, and (2) cruel and barbarous treatment. The husband answered denying the charges and, after lengthy hearings, the master recommended that a divorce be granted on the charge of indignities. The master, sustained by the court below, dismissed the charge of cruel and barbarous treatment as unsubstantiated by the evidence. The court below dismissed defendant's exceptions to the master's report and granted the divorce on the ground of indignities. This appeal by the defendant followed.

It is our duty to examine the evidence de novo for the purpose of determining whether the charges alleged in the complaint have been sustained. *Bobst v. Bobst,* 357 Pa. 441, 54 A. 2d 898; *Boyles v. Boyles,* 179 Pa. Superior Ct. 184, 116 A. 2d 248.

The parties were married on January 2, 1937 at Pittsburgh, Pennsylvania. They have lived in Pennsylvania since their marriage and presently reside in Bethel Borough, R. D. 10, Pittsburgh, Pennsylvania, where they have been living for about eight years. Plaintiff was 42 years of age and defendant 45 years of age at the time this divorce proceeding was instituted. There were four children born of the marriage, two boys and two girls, ranging in age from 5 to 16

at the time of the hearings. Plaintiff is a housewife and is also engaged in part time employment selling plastic kitchenware and perfume. Defendant was previously engaged in the real estate and building construction business but is now in the gas and oil well drilling business.

The bill of particulars filed by the plaintiff contains the following averments of physical violence inflicted upon her by the defendant:

"1. On July 21, 1953, the defendant attacked the plaintiff, choked her and said he intended to kill her.

"2. In the spring of 1953, the defendant on a number of occasions inflicted severe bruises on the plaintiff.

"3. In the fall of 1952, the defendant on a number of occasions hit the plaintiff and inflicted injuries on her."

To support the charge of cruel and barbarous treatment as summarized in the above averments the plaintiff testified as follows concerning the alleged attack in July, 1953: "I came home, it was late, and I went to bed. He came in from across the hall, walked around the bed and came over and put his hands on my throat, and said that he was going to do away with me, that he had just taken enough from me, and that he had been advised that the only thing that could be done with a son-of-a-bitch like me was to kill me, and that he intended to. Q. How hard did he grab your neck? A. Hard enough that I was afraid I was going to lose consciousness. I mean it was done deliberately. Put his hands to my throat and kept tightening, and I wondered what to do. I wondered could I fight him off or what. And then I realized that if I would do anything that he might, you know, get worse, and he might just choke me. So I just didn't do anything. I tried to talk, and I couldn't even talk; and he got up

and left. . . . Q. Did you think he might kill you? A. Yes." Defendant denied he ever attempted to choke his wife. He testified there was an argument about plaintiff being out so late and claimed she "undertook to throw me out of the room. She just had another tantrum, and again I just held my arm out straight to keep her away from me." In support of the allegation that defendant inflicted severe bruises on her on a number of occasions in the spring of 1953 the plaintiff cites two incidents. On one occasion she was helping their son Lynn with his studies and defendant objected. She testified: "Jarvis came in between us and knocked me so hard I fell to the floor, hit my head against the dishwasher, . . ." On another occasion during a discussion about going out to dinner when she reached for defendant's wallet she testified: ". . . he shoved me with all his might against the kitchen table. I mean my back was to the table and his to the freezer, and he shoved me as hard as he could against the table. And I bounced; he said later I bounced into him, but it wasn't that. He brought up his forearm and hit me across the nose so badly that it was sore for weeks. I mean I could hardly breathe through it." Plaintiff testified that on another occasion "he hit me so hard that I even feared I had a head injury. I mean it hurt so bad, I was getting chills and everything. I went over to my friend's house, and she put me to bed."

Defendant denied that he ever used physical violence on the plaintiff and contends that in order to keep her from attacking him it was necessary to hold her away from him. It is apparent there were frequent altercations between the parties. Defendant admits to the use of what he considered a restraining force on the plaintiff to prevent her from attacking him. Moreover, Dr. Clark, a psychiatrist who had been consulted at various times by the plaintiff since 1949, testified:

"Q. Did you ever see her [plaintiff] when she had any bruises on her? A. Yes. Once in June of 1953 she came to my office, and she had a summer dress on with rather high sleeves, and I noticed some bruises on her upper arms. She did not mention them at first, and I asked her when she got them and how, and she said it was during an altercation with her husband. Q. Did she say that he had done it? A. Yes, he had taken her by the arms."

Based on our independent review of the testimony we conclude that the master properly found as a fact that "2. Defendant has on a number of occasions committed acts of physical violence against plaintiff." However, cruel and barbarous treatment within the meaning of the Divorce Law consists of actual personal violence or a reasonable apprehension thereof, or such course of treatment as endangers life or health and renders cohabitation unsafe. *Edelman v. Edelman*, 165 Pa. Superior Ct. 485, 69 A. 2d 165. Although the defendant did physically abuse the plaintiff there is no proof her life has been endangered or that cohabitation with the defendant is unsafe. The fact that the cohabitation has continued throughout the marital difficulties of the parties and throughout the divorce proceedings fully refutes any contention that plaintiff's life was endangered. See *Oliver v. Oliver*, 172 Pa. Superior Ct. 600, 602, 94 A. 2d 124. Plaintiff's charge of cruel and barbarous treatment was therefore properly dismissed by the master and the court below as not substantiated by the evidence.

The essential feature of the offense of indignities to the person is that it must consist of a course of conduct or continued treatment which renders the condition of the innocent party intolerable and his or her life burdensome. *Bredbenner v. Bredbenner*, 175 Pa. Superior Ct. 580, 107 A. 2d 169. The facts recited

above concerning the acts of physical violence committed by the defendant, though insufficient to sustain the charge of cruel and barbarous treatment, are relevant and material proof on the issue of indignities. *Trimbur v. Trimbur,* 171 Pa. Superior Ct. 541, 91 A. 2d 307. In addition to the facts previously stated the plaintiff also charged that her husband continuously made false and unwarranted charges of adultery against her. In support of this charge plaintiff testified concerning an incident which occurred on September 13, 1953 when she went upstairs to dress. "Jarvis came in the room, and I had just—I didn't have a dress on. I mean I was just in underwear, and I had a bruise on my leg. He said to me—I mean he had been like fussing and fretting with me all morning. I mean picking on one thing after another. So he says to me, 'Where did you get that bruise on your leg?' I looked, and I said, 'Probably on the corner of the bed or something.' He said, 'There is only one way you could have gotten a bruise there, and I am going to take you before a squire and charge you with adultery.' I said, 'Look, I have heard that so often I think it would be a good idea, because then the thing would be public. You would have to make the charge, and you would have to prove it.' I said, 'I'm sick and tired hearing this all the time, and I think it an excellent idea if you do, and I want you to make a formal charge.'" The defendant did not deny the incident but testified as follows: "I went up to get my golf clubs. She had been washing in the bathroom, and had come through and entered the bedroom at the same time I did. She was in her birthday suit. I had noticed innumerable black and blue marks over her lower extremities, buttocks and down the inside of her legs, and I said that I thought that called for an explanation. It had happened many times before within the last year. She

made no answer and gave me a dirty laugh. I said to her that if that meant what I thought it meant, that it was time that either she or I did something about it, that I would devote some of my time to straightening out the mess." He further testified, "I have not accused her of adultery, I have not hired detectives to trail her, and I believe her allegation is pure fabrication. She knows better than I do whether she is guilty of adultery or not." Plaintiff also testified that at the conclusion of this episode the defendant stated: "I am devoting the rest of my life to your downfall." This statement was corroborated by the testimony of a Mrs. Dornish who was visiting in the home of the parties at the time. It is well settled that continuous unfounded accusations of infidelity, accompanied by other degrading conduct, are sufficient to make out a case of indignities to the person. *Bredbenner v. Bredbenner*, supra; *Miln v. Miln*, 175 Pa. Superior Ct. 613, 106 A. 2d 862. To amount to indignities justifying a divorce, the charge of infidelity made by the defendant not only must be false, but must have been without reasonable ground for believing it to be true. *Orsuto v. Orsuto*, 171 Pa. Superior Ct. 532, 91 A. 2d 284. It is obvious from the testimony quoted above that there was no basis or justification for the defendant's charge. Also, there was no evidence whatsoever that plaintiff was associating with other men. We therefore agree with the conclusion of the master: "While this isolated charge of adultery would not in itself be a sufficient ground for indignities, it forms, along with the other allegations which the Master finds to be true, a pattern of action on the part of the defendant sufficient to make out a case of indignities."

It would serve no useful purpose to relate in detail other conduct of the defendant upon which plaintiff relies to establish the charge of indignities. It is

sufficient to mention defendant's continued encouragement of the children, especially the oldest boy, in ridiculing and disobeying their mother, his hostile attitude toward her work as a saleslady for plastic ware evidenced by his scattering of the contents of a sample kit in the back yard of their home, his unwarranted suspension of the telephone service leaving his wife and four children without such service while he was frequently away from home on business, his refusal to allow plaintiff to handle money making it unnecessarily difficult for her to procure necessaries for the family while he is away from home, and his actions in humiliating and embarrassing plaintiff in the presence of others. While the defendant either denied, contradicted or attempted to explain these actions we are agreed the charges were sustained by a fair preponderance of the evidence. Moreover, the effect of this degrading and humiliating course of conduct on the plaintiff's health was established by the testimony of Dr. Robert A. Clark, who was the Director of the Out-Patient Department of the Western Psychiatric Institute and Clinic and Associate Professor of Psychiatry at the University of Pittsburgh. Dr. Clark testified on March 26, 1954, that he had seen plaintiff professionally about five or six times in the preceding year. He testified: "When she comes in she would often be tearful, and she would tremble a good deal and say she was very nervous and upset because of continued troubles at home. She would say that she was depressed and didn't know what to do about the situation. Q. What did she blame the situation on? A. She said that whenever her husband was at home that life would be hard for her because of what he said and did, that she felt that he was saying things which he knew would stir her up and make her more anxious and depressed and irritable. . . ." The impairment of health result-

ing from cohabitation with the other spouse is in itself strong supporting evidence of indignities. *Clark v. Clark,* 160 Pa. Superior Ct. 562, 52 A. 2d 351.

We are all agreed there was a course of conduct on the part of the defendant which obviously rendered the condition of plaintiff intolerable and her life burdensome. As stated by President Judge RHODES in *Nedwidek v. Nedwidek,* 172 Pa. Superior Ct. 252, 93 A. 2d 871: "Defendant's conduct was humiliating, degrading and inconsistent with plaintiff's position and relation as a wife."

The master's report, comprising 39 typewritten pages, contains a searching and comprehensive analysis of the testimony. He properly concluded that no less than 7 of the 19 specifications in plaintiff's bill of particulars were either not supported by the evidence or did not constitute indignities to the person. It is also noted that counsel for the defendant conducted a vigorous cross-examination of the plaintiff and offered considerable direct testimony in an effort to prove that plaintiff was at fault or largely to blame for the marital difficulties of the parties. However, as the lower court observed: "Plaintiff's conduct may be significant in determining whether there was justification or provocation for the acts of the defendant, but because this is a divorce from bed and board, *the conduct of the plaintiff cannot bar her from prevailing if defendant's conduct amounts to indignities."* (Emphasis added) In our Divorce Law[1] there is no requirement that a wife, suing for divorce a mensa et thoro because of personal indignities, must be an "innocent and injured spouse." *Wick v. Wick,* 352 Pa. 25, 42 A. 2d 76. Nor is it necessary in actions for absolute divorce that the

---

[1] Act of May 2, 1929, P. L. 1237, §11.

plaintiff be wholly free from fault. *Newman v. Newman,* 170 Pa. Superior Ct. 238, 85 A. 2d 613.

There was considerable conflict and contradiction in the testimony of the parties and the testimony of their witnesses, except that of Dr. Clark, was inconclusive. In making our own independent review of the record, which includes 408 typewritten pages of testimony, we have given the fullest consideration to the conclusion of the master upon the question of credibility. *Megoulas v. Megoulas,* 166 Pa. Superior Ct. 510, 512, 72 A. 2d 598; *Sharpe v. Sharpe,* 177 Pa. Superior Ct. 76, 81, 82, 110 A. 2d 804.

Decree is affirmed.