## Foley *v.* Foley, Appellant.

Argued November 13, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, ERVIN, and WATKINS, JJ. (WOODSIDE, J., absent).

*Clyde P. Bailey,* with him *Thomas P. Mulvaney,* for appellant.

*J. D. Golding,* for appellee.

OPINION BY WATKINS, J., December 9, 1958:

This is an appeal from a decree of the Court of Common Pleas of Allegheny County, granting John E. Foley, the appellee husband, an absolute divorce from Gertrude Foley, the appellant wife, on the grounds of desertion and indignities.

The complaint originally charged desertion alone but was amended to include indignities and cruel and barbarous treatment. The master recommended a divorce on the ground of desertion and found that the husband was not entitled to a divorce on grounds of indignities nor cruel and barbarous treatment. Exceptions were filed by the wife and the court below sustained the master's finding as to desertion, and in addition to desertion, found him to be entitled to a divorce on the ground of indignities.

"Neither the court below nor this Court can escape the burden of a careful consideration of the evidence to ascertain if it establishes the statutory grounds for a divorce. The rule generally applicable to proceedings before a master or an auditor, that a finding of fact will not be disturbed except for manifest error, is not applicable to divorce cases." *Boyer v. Boyer,* 183 Pa. Superior Ct. 260, 263, 130 A. 2d 265 (1957).

Of course, the master's report is entitled to the fullest consideration as regards the credibility of witnesses as he has seen and heard them. The court below, in reading the record can apply the law to the facts just as easily as the person who saw and heard the witnesses. The appellate Court has the same responsibility on appeal.

The parties were married on December 6, 1945 when they were both 28 years of age. There are no children. At the time of the marriage the husband was a part time student at Duquesne University and was working for an accounting firm. The wife was a registered

nurse and during her married life continued to be employed at various hospitals during most of her married life.

From December, 1945 to February, 1950 the couple made their home with the husband's mother at No. 1636 Rose Street, Pittsburgh. The wife, however, retained her room at the hospital where she was employed, stayed overnight there, coming home on weekends on holidays. In February, 1950 they rented an apartment at 629 Gettysburg Street, where they lived until June, 1951. In June of 1953 the parties resided at 639 Mellon Street until the final separation on September 10, 1953.

There were numerous separations in this unhappy marriage. They only lived together for a period approximating two years. After each separation it was the husband who tried to preserve the marriage and was the moving party in attempting reconciliation. From the date of the final separation on September 10, 1953 until the filing of this complaint on August 17, 1956, the appellant did not ask for money or seek support.

The master properly reviewed the entire history of this unhappy marriage in determining whether the act of September 10, 1953 on the part of the wife constituted willful and malicious desertion. The record shows that from the beginning there were constant quarrels growing out of her financial demands; that she had a strong desire not to be a housewife and an intent to live apart; that she had him arrested for surety of the peace and assault and battery without cause; that they quarreled about her calling former boy friends; that she had an affair with an interne at the Municipal hospital; that she told her husband in the presence of others that she was in love with this doctor and that the doctor was in love with her; that

he found the doctor's clothing in her room at the hospital; and that after reconciliation, while living at 639 Mellon Street, in 1953, the doctor admitted to the husband that he was still seeing her. On September 10, 1953 the parties quarreled over the writing of a check by the wife that overdrew his account in the bank. He had pointed out to her how such a thing was embarrassing to him in his position as an accountant. She ordered him out of the house, on threat of arrest and told him if he tried to return he would be arrested. He called his wife, later the same day, to see if he could get his clothing and personal belongings and was again advised that he would be arrested if he appeared at the common home.

The appellee, apprehensive of arrest because of his prior experience, secured the services of a constable and went to the home for his personal belongings the next day. The constable testified that he entered the house and found the husband's clothing in the hallway where they had been thrown. He also testified that at the request of the appellant he secured the key of the apartment from the appellee and turned it over to her. She said, "I'm glad to get the key from him because I don't want him back any more."

There is no evidence but that the husband was mild mannered and peaceful, a man of good habits. There was not a breath of scandal or of guilt connected with him. Even the appellant has not claimed any misconduct on his part so that, if grounds of divorce are present in this record, he is an injured and innocent spouse.

Desertion not only consists of a "willful and malicious abandonment of the common home. Desertion results also where one is excluded from the home by the other spouse, willfully and without justification." *Heimovitz v. Heimovitz,* 161 Pa. Superior Ct. 522, 55 A.

2d 575 (1947); *Reiter v. Reiter,* 159 Pa. Superior Ct. 344, 48 A. 2d 66 (1946). "A spouse who turns the other out of doors clearly manifests thereby an intent to desert. If for two years thereafter his conduct indicates a continuance of such intention, the libellant, who has been compelled to withdraw from the common habitation, is entitled to maintain a suit for divorce a.v.m. on the ground of desertion." Freedman, Law of Marriage and Divorce in Pennsylvania, Section 243, page 593.

Certainly here the root of the trouble in this marriage came from the wife's persistent desire to live apart from her husband. She forced him from the common home and refused permission for him to return by threat of arrest. This action persisted in for two years and upwards and without reasonable cause was of the nature contemplated in law to be willful and malicious desertion. *Reiter v. Reiter,* supra.

The Supreme Court, although reversing this Court in *Zorn v. Zorn,* 382 Pa. 319, 114 A. 2d 907 (1955), expressly approved the rules laid down in the *Reiter* case. It held, at page 323, that the plaintiff "was not an innocent spouse, and that the conduct of defendant and her sons did not constitute a forcible eviction of plaintiff from the home, nor did it put plaintiff in justifiable fear of immediate bodily harm or of his being locked out without his will and against his consent." The principle of the *Reiter* case was again clearly enunciated in *Dukenfield v. Dukenfield,* 177 Pa. Superior Ct. 215, 110 A. 2d 858 (1955), and although there was a dissenting opinion filed, an allocatur was refused by the Supreme Court. See also: *Danze v. Danze,* 185 Pa. Superior Ct. 111, 114, 137 A. 2d 809 (1958).

We agree with the court below that a case of indignities was made out in this record and that the master "treats rather lightly and airily the conduct of the de-

fendant with regard to her relations with a certain doctor . . ."

"It is, of course, impossible to lay down any general rule as to what constitutes such indignities to the person as to render the condition of the injured spouse intolerable and life burdensome; such matters necessarily depend upon all the circumstances of the particular case and the position in life, character and disposition, of the parties." *Hewitt v. Hewitt,* 136 Pa. Superior Ct. 266, 7 A. 2d 45 (1939). "The offense is complete when a continued and persistent course of conduct demonstrates that the love and affection upon which the matrimonial status rests has been permanently replaced by hatred and estrangement": *Boyer v. Boyer,* supra, at page 271.

The evidence discloses that the husband had received a medical discharge from the service and the wife knew of this and that he suffered emotional and psychiatric strain working and at the same time studying for a certified public accountant examination. The master said, "the evidence does not show that the defendant was responsible for the origin of the plaintiff's mental disorder, but it does show that she did much to aggravate it and little to relieve it." His health became so bad that he was forced to undergo psychiatric and shock treatment.

This disposition of the husband to nervous and emotional illness must be taken into consideration as we study this record. From the beginning a lot of the discord arose because of the husband's earning capacity. He was attending school and was not in a position to demand a large income although he was employed as an accountant. She constantly made derogatory comparisons between him and the men in the medical profession. It seems perfectly clear that a man suffering from extreme sensitivity, such as this man's

trouble indicated, when confronted with constant arguments about money, the public disgrace of an arrest and evidence of his wife's infidelity, did render his condition intolerable and his life burdensome.

The court below was persuaded that the appellant was guilty of indignities by his following summation of record facts.

"In the spring and summer of 1949 plaintiff was on an out-of-town assignment for his employers. On his visits home some of his friends commented on the fact that they had seen his wife in the company of another man at various times, and the friends chided plaintiff about it. On inquiry plaintiff found out that defendant was keeping company with the doctor. Plaintiff approached his wife about it, and she admitted she loved the doctor. The doctor also admitted to plaintiff that he loved the defendant. After this revelation defendant insisted on staying at the hospital, and refused to stay with plaintiff. After much urging she permitted plaintiff to visit her, and finally she agreed to leave the hospital, provided plaintiff went to get her clothes. When plaintiff went to his wife's room in the hospital he found a man's pipes in the room, and a pair of men's trousers in his wife's dresser drawer. Defendant admitted they belonged to the doctor. Shortly after her return home she absented herself under mysterious circumstances for two days and two nights, and when she returned her explanation for the absence was that she had attended movies, wandered around, sleeping in the parks, although her clothing did not indicate that kind of living, since her clothing remained spotless. When pressed for an explanation she said, 'Well, I refuse to tell you where I was'. Plaintiff called the doctor involved and asked him if he hadn't called his wife, and he admitted being with her for the time she was absent.

"After this episode the wife left again and plaintiff tried to get in touch with her to iron out the difference, but the next day a policeman served him with a warrant to appear before a justice of the peace to face a charge of surety of the peace and assault and battery. At the hearing defendant declared she wanted plaintiff to stay away from her, not to call her and not to bother her. She also stated that she was going with a doctor, and upon this note the hearing broke up. The immediate result of this experience was that plaintiff no longer carried on with his work, couldn't concentrate sufficiently to carry on with his studies, dropped out of the C.P.A. class and walked out of his work, telling his employers he did not know when he would be back. Plaintiff, even prior to marriage, was not in good health, and as a consequence this experience of knowing his wife was interested in another man did violence to his health. He visited a psychiatrist, Doctor Marvin R. Plesset, and underwent a series of shock treatments.

"Out of the arguments concerning the doctor defendant struck plaintiff across the face with a water glass, and then attacked him with a large flashlight which opened a gash in his forehead.

"Plaintiff's sister also testified that she heard defendant admit she loved the doctor. During their marriage defendant insisted on calling former boy friends, and regardless of her husband's feelings about it she continued to do so."

But even after this course of conduct the appellant sought and obtained reconciliation so that they were living together from June or July of 1953 until the final separation of September 10, 1953. We must assume, therefore, that the husband forgave his wife for what we will describe as indiscretions but if this be a condonation it does not bar an action based on indig-

nities to the person. *Nixon v. Nixon,* 329 Pa. 256, 259, 198 A. 154 (1938). See also *Phipps v. Phipps,* 368 Pa. 291, 81 A. 2d 523 (1951).

Decree affirmed.