## Decker *v.* Decker, Appellant.

Argued March 22, 1960. Before RHODES, P. J., GUN-THER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONT-GOMERY, JJ.

*Michael E. Rainone,* with him *Alfeo P. Libetti,* for wife, appellant.

*Edmund P. Hannum,* with him *Thomas M. Hynd-man,* for husband, appellee.

OPINION BY ERVIN, J., April 13, 1960:

On August 29, 1952 Antoinette Decker filed a complaint in Common Pleas Court No. 7, Philadelphia, seeking a divorce a.m.e.t. from her husband, Ralph Decker. On October 6, 1952 Ralph A. P. Decker filed a complaint in Common Pleas Court No. 1, Philadel-

phia, seeking a divorce a.v.m. from his wife, Antoinette Decker. The latter case was transferred to Common Pleas No. 7 and the two cases were heard together. The testimony was heard by Judge GERALD A. GLEESON, following a custom in Common Pleas No. 7 of having a judge sit as a master in a contested divorce case. It consumed about one week of the judge's time to hear the testimony. While we do not like to be critical of this practice, it does seem to us to be a terrible waste of time in this day of crowded court calendars and one which could have been avoided by the use of a master from the bar. Judge GLEESON filed an opinion and entered an order dismissing both complaints. Exceptions were filed by the plaintiff in each case. The court in banc, consisting of President Judge JOSEPH SLOANE, and Judges GERALD A. GLEESON and FRANCIS X. MC-CLANAGHAN, unanimously dismissed the exceptions in the a.m.e.t. action, finding that the husband, Ralph Decker, did not commit indignities to the person, cruel and barbarous treatment or malicious abandonment of his wife, Antoinette Decker. In the a.v.m. action President Judge SLOANE and Judge MCCLANAGHAN found that the husband had been driven from the marital home by the wife and her mother on May 15, 1946 and that the exclusion was without the consent of the husband and was willful and malicious within the meaning of the Divorce Act and granted him a divorce a.v.m. Judge GLEESON dissented. Antoinette Decker appealed in both cases.

We have carefully read the 711 typewritten pages of testimony and agree with the findings of the majority of the court below.

Much of the appellant's argument is addressed to the fact that the question of credibility should be decided as it was decided by Judge GLEESON, the judge who heard the testimony.

We repeat what has been so well said by Judge WOODSIDE in *Boyer v. Boyer*, 183 Pa. Superior Ct. 260, 262, 263, 130 A. 2d 265: "It is incumbent upon us on appeal from a decree of divorce, except where there has been a jury trial, to review the testimony, and adjudge whether it sustained the complaint of the plaintiff. Neither the court below nor this Court can escape the burden of a careful consideration of the evidence to ascertain if it establishes the statutory grounds for a divorce. The rule generally applicable to proceedings before a master or an auditor, that a finding of fact will not be disturbed except for manifest error, is not applicable to divorce cases. Nor do the findings of fact made by a judge have the same effect on appeal as a verdict of a jury: McKrell v. McKrell, 352 Pa. 173, 179, 42 A. 2d 609 (1945). We must examine for ourselves the testimony in cases heard without a jury and determine therefrom, independently of the findings of the master, or even the court below, whether in truth and in fact a legal cause of divorce has been made out. Nacrelli v. Nacrelli, 288 Pa. 1, 5, 6, 136 A. 228 (1927); Dash v. Dash, 357 Pa. 125, 126, 127, 53 A. 2d 89 (1947); Mendenhall v. Mendenhall, 12 Pa. Superior Ct. 290, 298 (1900); Hurley v. Hurley, 180 Pa. Superior Ct. 364, 366, 119 A. 2d 634 (1956).

"The master's report, although advisory only, is to be given the fullest consideration as regards the credibility of witnesses whom he has seen and heard, and in this respect his report should not be lightly disregarded. Brown v. Brown, 163 Pa. Superior Ct. 490, 493, 63 A. 2d 130 (1949); Megoulas v. Megoulas, 166 Pa. Superior Ct. 510, 512, 72 A. 2d 598 (1950); Smith v. Smith, 157 Pa. Superior Ct. 582, 583, 43 A. 2d 371 (1945); Green v. Green, 182 Pa. Superior Ct. 287, 126 A. 2d 477 (1956)." See also *Foley v. Foley,* 188 Pa. Superior Ct. 292, 294, 146 A. 2d 328.

Little need be said about the wife's charges of indignities to the person, cruel and barbarous treatment or malicious abandonment because the three judges of the court below agreed that they did not exist and our review of the entire record is in accord. We are convinced, however, by the record, that the husband was driven by force and violence from the matrimonial abode by the wife and her mother. He was also prevented from returning to that abode and this course of conduct was persisted in for a period exceeding two years. In this connection we repeat what Judge WATKINS so well said in *Foley v. Foley*, supra, at pages 296 and 297: "Desertion not only consists of a 'willful and malicious abandonment of the common home. Desertion results also where one is excluded from the home by the other spouse, willfully and without justification.' Heimovitz v. Heimovitz, 161 Pa. Superior Ct. 522, 55 A. 2d 575 (1947) ; Reiter v. Reiter, 159 Pa. Superior Ct. 344, 48 A. 2d 66 (1946). 'A spouse who turns the other out of doors clearly manifests thereby an intent to desert. If for two years thereafter his conduct indicates a continuance of such intention, the libellant, who has been compelled to withdraw from the common habitation, is entitled to maintain a suit for divorce a.v.m. on the ground of desertion.' Freedman, Law of Marriage and Divorce in Pennsylvania, Section 243, page 593."

The parties were married on April 29, 1944 and lived together at the home of the wife's mother until May 15, 1946. According to the husband the parties got along very well until the last six months. The husband and his brother had a junk business. On occasion his work would keep him late for dinner and the wife complained to him about this. On one or more occasions she refused to get dinner for him because of his lateness.

On the night of May 15, 1946 a quarrel occurred at the dinner table in which the wife attacked the husband with a knife and in disarming her the husband was cut. He left the house under the attack of his wife and her mother and has never returned. Permission to return was refused and he was denied permission to return for his clothing or to have his relatives do so. Permission was given to have a police officer enter the house and secure the clothing. After being evicted from the house the husband met Officer Raymond De-Haven, who testified that he saw Mr. Decker as he was coming away from the common abode and that Mr. Decker "had a cloth wrapped around his hand, and it was all bloody." This officer also testified that on the next day he went down to the common abode with Harry, the brother of Mr. Decker, and that the wife would not let Harry in the house to get Mr. Decker's clothes "so I went on up and asked her for the clothes, and I carried them out, a number of suits and over-coats and topcoats and shoes and shirts." He took the clothes to brother William's home, where Mr. Decker was then staying.

The mother, Anna Carman, testified that she bit Mr. Decker on the wrist in order to free herself from his hold. She also testified that "He did run out of the house, sure, and he had a hole in his hand that was done by me, which I had to do to free myself from his grasp." From a reading of the testimony there can be little doubt that quite an encounter occurred at the dinner table on the night of May 15, 1946. Undoubtedly, the wife and her mother physically attacked the husband. They must have gotten the better of him because he ran out of the house. There were no witnesses to this encounter except the mother, daughter and her husband. All parties agree that he was wounded. He says that he was cut when he attempted to take

a knife away from his wife. The wife denies cutting him but the mother admits that she bit him in the wrist. All parties agree that he left the premises. It is reasonable to conclude that the two women were getting the better of him or he would not have left the premises. The police officer confirms the fact that Mr. Decker's hand was bleeding when he saw him shortly after he left the premises. The parties agree that they would not permit him or any of the members of his family to return for his clothing.

The testimony is also clear that Mr. Decker on numerous occasions after this occurrence sought a reconciliation with his wife. He even took her to Bloomsburg, 12 miles from Berwick, to look at a nice home which he offered to buy for the parties if the wife would come to live with him. The wife refused to do this, according to her own testimony. No charge is made that the offers of reconciliation were not bona fide. We believe that they were. The husband even sent his sister to see the wife in an endeavor to accomplish a reconciliation. The wife's mother was probably responsible for the inability of the parties to reconcile. She had evidently made up her mind to prevent this from occurring.

Whether the constructive desertion be taken from May 15, 1946 or any date within a period of six months thereafter, when the reconciliation was attempted, the parties have remained apart from each other for a period of nearly 14 years. After seeking on numerous occasions to bring about a reconciliation, the husband finally gave up hope. We are in accord with that part of the opinion by the majority of the court below wherein they said: "It appears undisputed that following the separation, the wife would not consider reconciliation. (N.T. 408-416, 365). Indeed, her testimony is to this effect. (N. T. 103-112). This evidence is relevant to

show the wife's state of mind at the time of and immediately following her husband's departure. From it, there comes the plain implication that the separation of the parties was what the wife intended and wanted, and the legal sequence follows, that it was wilful and malicious on her part. The element of lack of consent is shown by the efforts of the husband toward a reconciliation.

"But the evidence on refusal of reconciliation, which the trial judge agreed was established, supports an alternative ground of decision that likewise disposes of the case regardless of what occurred on May 15, 1946. The wife's refusal of her husband's earnest efforts at reconciliation in itself, constituted desertion on her part. See Freedman, Marriage and Divorce in Pennsylvania (2nd ed.), sec. 240. The offer of the husband was bona fide, distinct and unequivocal. On this basis, also, the husband was entitled to a divorce."

There was considerable testimony concerning the conduct of the husband at the reception in the mother-in-law's home and store after the marriage on April 29, 1944. The wife testified that the husband became angry at her and left the wedding reception and went upstairs and remained there for several hours, leaving the guests to fare for themselves. The husband denied this completely. The wife produced her mother and her sister, Virginia Vetrulli, to corroborate her story. The wife testified that the husband beat her and tore her dress in the bathroom on this occasion. She also produced Angelina Colone, a 69-year old woman, to corroborate her and this witness admitted that she did not see Mr. Decker go upstairs. She also produced Matilda Pennles, a 75-year old woman, to corroborate her but Judge GLEESON could not accept her story as the truth and Mr. Rainone, counsel for the wife, said: "I think your Honor is right." On the other hand, Mr. Decker pro-

duced Catherine Hagenbuch, who was no relation of his, who gave an entirely different picture of the wedding ceremony. She saw nothing out of order at the reception and testified that both the husband and wife were present during all the time she was there. John B. Morrison, who also was not related to Mr. Decker, testified that he remained at the reception until the bride and groom left and that he saw nothing wrong. He also stated that Mr. Decker and his wife were present. In addition to the testimony of those disinterested witnesses, Mr. Decker produced his brothers, Harry and William, who corroborated his testimony that nothing unusual occurred at the reception. We believe that the preponderance of the evidence, as well as the disinterested witnesses, favor the picture of the wedding reception as painted by the husband.

The wife also produced a Dr. Harry P. Scally, who at first testified that he saw the wife in July 1944, January 1945 and May 1946. The doctor, in direct examination, testified that Mrs. Decker had multiple contusions of the body and around the shoulders and arms and back and she also had a nervous condition. On cross-examination, however, he admitted that he had no records of the visits and he admitted that his memory had been helped by Mrs. Decker and that he had no independent recollection as to these matters. He also admitted that he had previously written a letter which showed that he could not have treated her in 1944, 1945 or 1946. This witness' testimony is unworthy of belief.

We believe that the evidence in this case clearly makes out a case of constructive desertion based upon two facts: (1) that he was put out of the common abode by justifiable fear of immediate harm, and (2) that he was locked out against his will.

Since the desertion has continued for a period of more than two years, the decree in the action a.v.m.

is affirmed; the order dismissing the action in the a.m.e.t. case is also affirmed.

———

DISSENTING OPINION BY WRIGHT, J.:

I would dismiss the husband's complaint in divorce a.v.m. upon the opinion of Honorable GERALD A. GLEESON, who heard the testimony. As a matter of procedure, I find no authority for the reversal of the decision of the hearing judge by the court en banc. On the merits, as Judge GLEESON has convincingly demonstrated, the husband entirely failed to prove the desertion alleged in his complaint. It is my view that a wife is not guilty of desertion when the husband, whose responsibility it is to provide the habitation, absents himself therefrom and the wife remains therein. See the dissent in *Dukenfield v. Dukenfield,* 177 Pa. Superior Ct. 215, 110 A. 2d 858.

RHODES, P. J., joins in this dissent.