393 A.2d 722

**Albert F. WIEGAND, Appellee,**

v.

**Ruby WIEGAND, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 17, 1977.

Decided Oct. 20, 1978.

Vincent C. Murovich, Jr., Pittsburgh, for appellant.

Andrew C. Van Gorder, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This is an appeal from an order granting a husband a divorce. The testimony was taken by a master, who recommended that the husband "be awarded a divorce . . . [on the ground] that he has suffered a constructive desertion, to wit, that [his wife] locked him out of his house without justification and without his consent, and that further her refusal to let him return persisted for a period of

two years." Master's report at 7. The lower court stated that "after an independent review of the evidence de novo . . . [citations omitted] we see no reason to disagree with the findings and conclusions of the Master and, therefore, accept his recommendation." Opinion of lower court at 2. Appellant argues that the findings and conclusions of the master are unsupported by, and contrary to, the record. We agree with her, and therefore reverse and dismiss the action.

Albert and Ruby Wiegand were married in 1947. They had two sons and lived together until May, 1966, when appellant had her husband arrested. After one unsuccessful attempt to return home, appellee moved in with his mother, a block away; since then he has lived with his mother. Appellee filed his action in 1972, alleging indignities. In 1973 he amended his complaint to allege constructive desertion, and apparently it was only on this ground that the action proceeded; neither the master nor the lower court made any findings regarding, or even discussed, the allegation of indignities.

In examining appellant's contention that the master and the lower court erred in finding constructive desertion, we bear in mind the scope of our review:

(1) even though the master before whom the testimony was taken, because of the opportunity afforded him to hear and to observe the witnesses, was in a better position than this Court to pass upon the credibility of such witnesses, the findings of the master, although entitled to due consideration, are not controlling or binding upon us: (*Nacrelli v. Nacrelli*, 288 Pa. 1, 6, 7, 136 A. 228 (1927); *Smith v. Smith*, 157 Pa.Super. 582, 583, 584, 585, 43 A.2d 371 (1945); *Langeland v. Langeland*, 108 Pa.Super. 375, 379, 380, 164 A. 816 (1933); Law of Marriage and Divorce in Pennsylvania, Freedman, (2d ed.) vol. 3, § 654 and cases therein cited); (2) except where a jury has rendered the verdict, this Court in a divorce action must review all the evidence and from such review determine whether the ground alleged as a cause for divorce has been legally established (*Bobst v. Bobst*, 357 Pa. 441, 444, 54 A.2d 898

(1947); *Esenwein v. Esenwein,* 312 Pa. 77, 80, 81, 167 A. 350 (1933)).

*Zimmerman v. Zimmerman,* 428 Pa. 118, 121, 236 A.2d 785, 787 (1968).

*And see Coxe v. Coxe,* 246 Pa.Super. 231, 369 A.2d 1297 (1976) (Concurring opinion, collecting cases). In deciding "whether the ground alleged . . . has been legally established," the rule we must apply is as follows:

The doctrine of constructive desertion is recognized in Pennsylvania. *Zorn v. Zorn,* 382 Pa. 319, 114 A.2d 907 (1955); *Schwertz v. Schwertz,* 197 Pa.Super. 255, 177 A.2d 139 (1962). As this Court stated in *Schwertz,* "[a] case of desertion is established where a wife locks her husband out of the house without justification and without his consent, refuses to let him return, and persists in such a refusal for a period of two years." Id., 197 Pa.Super. at 258, 177 A.2d at 141. This action must be willfully and maliciously undertaken and must be without the consent of the innocent spouse. *Foley v. Foley,* 188 Pa.Super. 292, 146 A.2d 328 (1958); *Reiter v. Reiter,* 159 Pa.Super. 344, 48 A.2d 66 (1946).

*Cammann v. Cammann,* 217 Pa.Super. 376, 379–80, 272 A.2d 241, 243 (1970).

The master found that after appellant had had appellee arrested, in May 1966, she had locked him out of his house. The master acknowledged that there was conflicting testimony as to whether or not appellee had a key, and as to whether or not the lock had been changed. Master's report at 4. If indeed, as appellant and the two sons (ages 25 and 24 at the time of the hearing) testified, appellee did have a key and the lock had not been changed, it is difficult to understand how one could find that he had been "locked out". *See* N.T. 42, 49, 50, 65, 70, 81, 82, 103. However, the master found it unnecessary to resolve the conflicting testimony because, he said, appellant's "[t]hreat of arrest (*Foley* ) [*Foley v. Foley,* 188 Pa.Super. 292, 146 A.2d 382 (1958)] or mere communication to the husband that the family house was closed to him (*Cammann* ) [*Cammann v. Cammann,*

*supra* ] is enough to constitute a 'locking out' ". Master's report at 4. Rather than resolve the conflicting testimony ourselves, we shall assume for the sake of discussion that appellant did, at least in some sense, "lock" appellant out of his house, and shall proceed to the critical issue in this case, which is whether appellant's action was "without justification". *Cammann v. Cammann, supra.*

Appellant described the background of the May 1966 arrest as follows:

Q. Did you and your husband have any difficulties prior to this?

A. Yes, there had been difficulties before this.

Q. Of what type?

A. Oh, the arguments and the pushing and shoving and the hitting. And Mr. Wiegand would come over sometimes, my father-in-law. Mrs. Wiegand never came over.

Q. Approximately when did these misunderstandings begin?

A. Say two, three years before 1966. Albert wouldn't work. He did not pay the last two or three years of the mortgage. My father-in-law and mother-in-law paid for the home. We wouldn't have had the house if they didn't pay the mortgage.

Q. He wouldn't work? What do you mean by that?

A. He wasn't interested in working. He wanted to be loaded all the time and not do nothing.

Q. What do you mean by loaded?

A. Drunk. Drinking.

Q. Was a quantity of alcoholic beverages kept on the premises?

A. Well, I would say that Albert managed to have a case of beer probably every other day, plus his whiskey.

Q. Was this something that he did continuous, or something that happened prior to the separation, or—

A. He would drink pretty steady for a while and then he would get sick and lay off for a couple of weeks,

maybe two, three weeks, and try to get along. Mrs. Wiegand tried to help him. Ray tried to help him. I had to help. My father-in-law tried to help him. We did everything we could for him.

Q. Now, during this period prior to 1966, were you being supported by your husband?

A. When my husband worked I got some money, yes.

Q. Did he work steadily for any period of time prior to this incident in May of 1966?

A. When he was able to he worked.

Q. Now, you say when he was able to work, what do you mean by that?

A. Well, when he would be himself and sober he would go over and work in the restaurant for his mother. He relieved the bartender and did the table work or do whatever Mrs. Wiegand wanted him to do.

N.T. 44–46.

Appellant also testified that appellee was an alcoholic, and that "whenever he would be drinking he would become abusive." N.T. 52. She testified that several times before May 1966, when appellee had been particularly drunk and abusive, she had had him arrested:

Q. Now, did you ever have your husband arrested on any occasion prior to this one in May of '66?

A. Yes.

Q. What was the nature of those arrests?

A. Same problem, the drinking and abusiveness.

Q. You say abusiveness. Will you be a little more specific about that?

A. Just that he would be nasty with me and hit me, and this arguing over anything at all that I would have to leave the house. That's all.

Q. And on these occasions would you call the police?

A. Yes. I had the police maybe three times to take him out of my home.

Q. On each one of those occasions you say he had been drinking and abusive?

A. Right.

Q. Did they also involve any physical contact?

A. Yes.

Q. Well, how were you able, if your husband was involved in physical contact with you, how were you able to call the police?

A. I would run out of the house and call the police from the neighbor's. The man always had the door locked. Maybe one of the children would come down and open the door and leave me in, leave the police in.

Q. Did you try to talk to your husband and reason with him rather than call the police?

A. Yes, I tried to talk to him but you couldn't talk to him. The man would be drunk. He didn't know what he was doing. You would have to get away from him.

N.T. 55–57.

With respect to the May 1966 arrest itself, appellant testified:

Q. Will you describe the type of beating that you received?

A. Albert was very drunk and abusive. He had been drinking for several months. Wouldn't work. Wouldn't do anything, in fact, because of the drinking. I had worked for Mrs. Wiegand in the afternoon, came home and an argument started. After the beating I went over to my mother-in-law. She and I both came back to the house. Albert had locked us both out, locked me out. The police came in the meantime. They got inside. Albert was in the dining room talking disorderly.

Q. Now, when you say you received a beating, what actually did you receive?

A. A good belt.

Q. What do you mean by that? Did you receive bruises?

A. The man hit me and threw me around and pulled my hair and this and that.

Q. What did he hit you with?

A. His fists.

Q. And you say he had been drinking?

A. Yes, very heavily.

N.T. 43.

Appellant's testimony was supported by the parties' older son, Albert, who testified:

Q. Were you also aware that your father was arrested?

A. Yes, he was.

Q. Do you know the reason for the arrest?

A. He beat my mother, physically abused her. Put welts on her, gave her bruises and just put her in a hysterical and emotional mood. She couldn't control herself.

Q. You also heard comments about your father's drinking. Did you ever see your father drink alcohol?

A. Yes, I have.

Q. Did you ever see him intoxicated?

A. Constantly.

N.T. 99.

In addition, the younger son, Richard, testified:

Q. Do you recall any incident that occurred in your home involving your father during the month of May?

A. Yes, I do. I saw my mother, she was pretty well shaken up, bruised, and she had the police there who were trying to get in the residence and the door was locked.

Q. Where were you?

A. I was on the outside on the street, you know, right out in front of the house.

Q. What time of day was this, approximately?

A. In the afternoon some time, three, four, something like that.

Q. The police were trying to get into the residence?

A. That's right.

Q. Then what happened?

A. Well, the door was locked and they couldn't break it down because of the lock. I guess there's a special lock for that and the police need a warrant or something. So I jumped over the fence and I opened up the garage door and I opened the garage door and they came in through the kitchen door which was almost open. I opened up that door and they got access to the kitchen. So that's how they got in.

Q. What, if anything, was in the kitchen, or who, if anybody, was in the kitchen?

A. My father was in the living room which is attached to the kitchen. He was stringing up a bow and arrow. He had like an archery set.

Q. What type of arrow?

A. Razor type, regular target arrows.

Q. You said he was stringing—what do you mean by that?

A. He was getting ready to shoot it, I imagine.

Q. You mean he was assembling or had already assembled, or what?

A. By the time the police got in it was all assembled. He had already strung it up.

Q. Where was your mother?

A. I believe she was with me or on the—I believe she was with me. I'm not sure if she was with me or not, or with the police or not.

Q. And was there anything else unusual about the living room or kitchen when you entered with the police?

A. I couldn't remember.

Q. When you say your father was stringing this arrow, did you notice anything else about him?

A. He was intoxicated, definitely.

Q. What do you mean by that?

A. He was loaded.

N.T. 79–80.

Both sons described appellee as an alcoholic, N.T. 92, 99. Richard described the family life together:

Q. . . . . Without leading you, I want you to explain what led you to believe that he was a drinking man?

A. He would be drinking in the house.

Q. That's what you mean?

A. He would be drinking beer, liquor in the house.

Q. How often would that happen?

A. Every day or just about every day until he would try to get himself together. He would be sick and then he would have to stop.

Q. Was he—

A. Getting sick from the liquor, or food, you know, not eating. He would just drink and he would get sick and then he would get better and then he would drink again.

Q. Did you ever see your father intoxicated other than this one occasion?

A. Yes.

Q. Could you estimate how many times?

A. I couldn't tell you. More than a thousand at least.

Q. You're indicating you can't state because of the number?

A. I couldn't tell you the number. It was frequently, very frequently.

Q. Did you ever know your father to have been arrested on charges brought by your mother?

A. Yes. He was arrested. I couldn't tell you how many times but he was arrested say more than three, four times.

Q. Did you ever know why he was arrested?

A. For beating her up, always would be pushing, shoving, arguing. I would be present sometimes and see it. Sometimes he would beat her and she wouldn't call the police and other times, if it got too severe she had no choice but to call the police. I was younger. I couldn't very well do anything, you know.

N.T. 84–85.

Appellee's testimony was in marked contrast with the foregoing. He testified that he had no idea why he had been arrested in May 1966. N.T. 5. (When appellee was arrested he was sent to the Behavior Clinic; he did not remember the Clinic or having been interviewed by doctors there.) He described his drinking habits as follows:

Q. Now, prior to your separation, did you drink excessively?

A. No.

Q. Did you drink at all?

A. No.

Q. You mean you didn't drink any alcoholic beverage? Did you drink beer?

A. Yes.

Q. You drank some beer?

A. Yes, but not to excess.

Q. Would you drink whiskey?

A. No.

Q. Just beer?

A. That's right.

Q. And how many bottles of beer would you say you would drink in a day?

A. In a day?

Q. Yes, sir.

A. About four, maybe.

N.T. 12–13.

He also testified that he has never struck appellant. N.T. 11.

Appellee's testimony was corroborated by his mother, who testified that she never saw her son drunk, N.T. 22, and that she never saw any bruises on appellant, N.T. 26. She also testified that appellant had made various statements threatening appellee, N.T. 21, but on cross-examination she conceded that she had never in fact heard such statements. N.T. 24–25. Appellee's uncle, who was called to testify on appellee's behalf, also stated that he never saw any bruises on appellant. N.T. 36. However, he did concede that "[h]e

[appellee] was intoxicated different times." N.T. 36. There were no other witnesses.

■ If appellant had grounds for divorce, she was justified in locking appellee out of his house. *Zimmerman v. Zimmerman, supra* ; *Cammann v. Cammann, supra* ; *Schwertz v. Schwertz,* 197 Pa.Super. 255, 177 A.2d 139 (1962); *Hughes v. Hughes,* 196 Pa.Super. 144, 173 A.2d 700 (1961); *Hensel v. Hensel,* 198 Pa.Super. 613, 184 A.2d 151 (1962). The master, however, concluded that appellant had failed to establish that she had grounds for divorce, specifically, either indignities or cruel and barbarous treatment. In arriving at this conclusion the master summarized the evidence as follows:

> With respect to the other two grounds, the testimony fails to establish a clear and continuing case either way. On the one hand we have Ruby claiming that she was afraid to live with Albert when he was drinking because he was "abusive": "he would be nasty with me and hit me and this arguing over anything at all that I would have to leave the house" (R. at 56). Richard Wiegand testified that Albert was arrested on occasion because he beat Ruby, "always pushing, shoving, arguing."

> On the other hand, the Defendant's son Albert testified that "his mother was emotional . . . unable to control herself" (R. at 105). Ruby had plaintiff arrested on a number of occasions, but she also once had her son Richard arrested (R. at 89). Moreover, charges were never pressed against Plaintiff after he had been arrested. Ruby claimed that, although she knew he was a sick man (R. at 62), the arrests provided them with the opportunity to "get a rest from each other, be it over night, two nights, three weeks, or be it two weeks" (R. at 62). Kathryn Wiegand, although not present when Plaintiff and Defendant quarreled, said she never observed bruises on Ruby's body or face (R. at 26). Raymond Wiegand similarly testified (R. at 36).

Master's report at 5.

We find ourselves unable to accept this summary.

The first paragraph of the summary substantially understates the testimony of appellant and the two sons. The general impression left is that appellant only *claimed* that appellee was "abusive"; there is no reference to the testimony regarding appellee's alcoholism, and the extent of the testimony of the sons is barely suggested.

The second paragraph of the summary is particularly troublesome, as will appear from a consideration of the statements in it, taken one after the other.

Albert did testify on cross-examination that on direct examination he had stated that his mother was "emotional . . . unable to control herself". N.T. 105. However, his full statement on direct examination, which has been quoted above, was as follows:

> A. He beat my mother, physically abused her. Put welts on her, gave her bruises and just put her in a hysterical and emotional mood. She couldn't control herself.

N.T. 99.

It is therefore clear that according to Albert, appellant's inability to control herself was the result of being beaten by her drunken husband, and not, as implied by the master, the result of her emotional nature.

It is also true that appellant "once had her son Richard arrested." However, in this regard Richard testified as follows:

> A. Well, when they separated in May, that summer things started to get bad, you know, because of lack of funds, stuff like that, and I was trying to make it on my own, and I didn't do a very good job because I was out late and things like that. I guess I was giving her a bad time. She wanted me to come in the right time and all that, so eventually one thing led to another thing and she had me—I gave her a hard time and she had me, not arrested, but she called the cops because she couldn't handle me. . . ..

Q. The police had you in friendly protective custody?

A. I guess I was bad, you know. What are you going to do with a man in and out around the house, just conventional.

.    .    .    .    .

Q. It was your mother or the police that took you into protective custody?

A. To teach me a lesson.

Q. As a matter of fact, on direct examination you stated you recall that your mother had your father arrested on two, three, four occasions?

A. That's right. It was for different reasons. Those were heavier charges.

Q. The same means but for a different reason?

A. That's right. She did it because she loved me, I imagine.

N.T. 89–91.

Again, the master's implication, that appellant had members of her family arrested without cause, is belied by the testimony.

The master next comments that "charges were never pressed against" appellee. Presumably the implication is that the charges were not pressed because they were without merit and were brought only for the purpose of harassment. Appellant, however, explained why she had never pressed the charges:

Q. To your knowledge he was never convicted of any charge?

A. I didn't want him to be a criminal. Why would I want him to have a criminal record? I wanted to help him as much as I could.

Q. Yet you had him arrested repeatedly, didn't you?

A. Maybe four, five, six times. I can't remember.

Q. If you didn't want him to be a criminal why did you have him arrested?

A. To protect myself. I was afraid of this man.

Q. You were harassing him, weren't you?

 A. I don't think so. I think I was very concerned about my husband.

N.T. 63.

Apparently the master disbelieved this testimony, although he never said so specifically. Nor does any reason for disbelieving the testimony appear; it was uncontradicted, and to a considerable extent corroborated by the two sons; also, it does seem rather surprising that the local police would be willing to make four or five arrests that were totally unwarranted.

After concluding that appellant had failed to show cruel and barbarous treatment, the master concluded that neither had she shown indignities. With respect to the latter, the master said:

> No doubt the couple quarreled at various times during the latter years of their marriage, and the testimony indicates that pushing and shoving may, on occasion, have accompanied these quarrels. However, "domestic disputes or differences are not a cause for divorce unless they have the magnitude and importance of indignities such as would render one's condition intolerable and life burdensome, and even violent quarrels participated in by both parties growing out of petty matters may not be sufficient" 12 P.L.E. Divorce § 36, p. 265, citing, inter alia, *McLaughlin v. McLaughlin*, 170 Pa.Superior 516, 87 A.2d 101 (1952); *Mathias v. Mathias*, 114 Pa.Superior 444, 174 A. 821 (1934); *Ramsey v. Ramsey*, 157 Pa.Superior 292, 43 A.2d 346 (1945).

Master's report at 6.

Our de novo review of the record reveals much more than "domestic disputes," which "may, on occasion" have been "accompanied" by "pushing and shoving." To the contrary, we find that there were frequent quarrels, precipitated by appellee and arising from his almost continuous state of intoxication, and frequently accompanied by appellee beating appellant, sometimes severely. We find incredible appellee's bare assertion that he never drank or struck appellant. Other than this assertion, there was no evidence

conflicting with the testimony of appellant and the two sons. The testimony by appellee's mother that she never saw him drunk, and the testimony by the mother and appellee's uncle that they never saw bruises, does not contradict appellant's evidence. Moreover, appellee's inability to work because of his drinking was indirectly corroborated by his mother, who admitted that she had had to help her son financially. N.T. 26, 28. (When he worked, appellee worked at his mother's restaurant.) Finally, we accept the uncontradicted testimony by both of the sons that their mother never did anything to provoke their father's behavior. N.T. 86–87, 101.

From these findings the conclusion follows that appellant did establish that appellee had committed indignities to her.

[T]he "essential feature of a charge of indignities", *Phipps v. Phipps*, [368 Pa. 291, 81 A.2d 523 (1951)], is a "course of conduct" that will depend "largely upon the circumstances of each case" but that in every case must be "inconsistent with the position and relation as a spouse," *McKrell v. McKrell*, [352 Pa. 173, 42 A.2d 609 (1945)], and render the condition of the injured and innocent spouse "intolerable" and his or her life "burdensome", Act of May 2, 1929, [P.L. 1237, § 10, as amended by the Act of Mar. 19, 1943, P.L. 21, § 1], 23 P.S. § 10.

*Steinke v. Steinke*, 238 Pa.Superior Ct. 74, 86, 357 A.2d 674, 680 (1975) (Concurring opinion, collecting cases).

Accordingly, appellant was justified in locking appellee out of his home.*

The order of the lower court is reversed and the action is dismissed.

JACOBS, President Judge, dissents.

WATKINS, former President Judge, and HOFFMAN and PRICE, JJ., did not participate in the consideration or decision of this case.

---

* It is therefore unnecessary to consider whether appellant was entitled to a divorce on the grounds of cruel and barbarous treatment, or whether appellee consented to the desertion and whether it persisted for the statutorily mandated two years.